No. _____

# In the
# United States Court of Appeals
# for the Third Circuit

---

RALPH "TREY" JOHNSON, *ET AL.*,
*Plaintiff-Respondent*
v.
NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, A/K/A THE NCAA*, ET AL.*,
*Defendants-Petitioners*

---

On Appeal from the United States District Court for the
Eastern District of Pennsylvania
Case No. No. 2:19-cv-05230-JP
Hon. John R. Padova, Presiding

---

# PETITION FOR INTERLOCUTORY APPEAL

---

**CONSTANGY, BROOKS, SMITH & PROPHETE LLP**

Steven B. Katz (Cal. Bar No. 139078)*
2029 Century Park East, Suite 1100
Los Angeles, California 90067
skatz@constangy.com
Telephone: (310) 909-7775
Facsimile: (424) 465-6630

John E. MacDonald (Pa. Bar No. 82828)*
989 Lenox Drive, Suite 206 (2nd Floor)
Lawrenceville, New Jersey 08648
jmacdonald@constangy.com
Telephone: (609) 454-0096
Facsimile: (609) 844-1102

COUNSEL FOR PETITIONERS NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, CORNELL UNIVERSITY, FORDHAM UNIVERSITY, LAFAYETTE COLLEGE, SACRED HEART UNIVERSITY AND VILLANOVA UNIVERSITY.

* Admitted in the Third Circuit.

# CORPORATE DISCLOSURE STATEMENT

Under FED. R. APP. PROC. 26.1 and 3RD CIR. R. 26.1, Petitioners certify that each of the Petitioners (National Collegiate Athletic Association, Cornell University, Fordham University, Lafayette College, Sacred Heart University and Villanova University) is a 26 U.S.C. § 501(c)(3) organization. They have no parent corporations, and no publicly held company owns ten percent (10%) or more interest in any Petitioner.

By: ____*s/Steven Bernard Katz*______
COUNSEL FOR PETITIONERS



7960752v.2

# TABLE OF CONTENTS

*PAGE*

CORPORATE DISCLOSURE STATEMENT .......... 2

TABLE OF CONTENTS .......... 3

TABLE OF AUTHORITIES ..........

SUMMARY OF PETITION .......... 8

STATEMENT OF FACTS AND PROCEDURAL HISTORY .......... 19

ARGUMENT .......... 22

I. THE DISTRICT COURT'S ORDER PRESENTS A CONTROLLING QUESTION OF LAW .......... 23

II. THE SEVENTH CIRCUIT, NORTHERN DISTRICT OF CALIFORNIA, AND DISTRICT OF INDIANA ALL REACHED THE OPPOSITE CONCLUSION FROM THE EASTERN DISTRICT OF PENNSYLVANIA. SUBSTANTIAL GROUNDS FOR DIFFERENCE OF OPINION EXIST .......... 24

III. IMMEDIATE APPEAL FROM THE ORDER WILL MATERIALLY ADVANCE THE ULTIMATE TERMINATION OF THIS LAWSUIT—AND ADDRESS A SIGNIFICANT UNRESOLVED QUESTION IN THIS CIRCUIT .......... 28

CONCLUSION .......... 32

CERTIFICATE OF COMPLIANCE .......... 33

CERTIFICATE OF SERVICE .......... 34

# TABLE OF AUTHORITIES

*PAGE*

## CASES

*F.T.C. v. Wyndham Worldwide Corp.*,
799 F.3d 236 (3d Cir. 2015) ........................................................... 30
*Bastardo-Vale v. Attorney General United States*,
934 F.3d 255 (3d Cir. 2019) ........................................................... 14
*Bellas v. CBS, Inc.*,
221 F.3d 517 (3d Cir. 2000) ........................................................... 26
*Berger v. National Collegiate Athletic Ass'n*,
162 F. Supp. 3d 845 (S.D. Ind. 2016),
*aff'd*, 843 F.3d 285 (7th Cir. 2016)................................................ 9, 27
*Bradburn Parent Teacher Store, Inc. v. 3M*,
2005 WL 1819969 (E.D. Pa. Aug. 2, 2005) ....................................... 25
*Colby v. J.C. Penney Co.*,
811 F.2d 1119 (7th Cir. 1987)........................................................ 14
*Coleman v. Western Michigan University*,
125 Mich. App. 35 (1983)................................................................. 9
*Dawson v. National Collegiate Athletic Ass'n*,
932 F.3d 905 (9th Cir. 2019)........................................................... 16
*Dawson v. Nat'l Collegiate Athletic Ass'n*,
250 F. Supp. 3d 401 (N.D. Cal. 2017)............................................ 9, 27
*F.T.C. v. Wyndham Worldwide Corp.*,
10 F. Supp. 3d 602 (D.N.J. 2014) ................................................... 29
*Ford Motor Credit Co. v. S.E. Barnhart & Sons, Inc.*,
664 F.2d 377 (3d Cir. 1981) ........................................................... 30
In re: *Chocolate Confectionary Antitrust Litigation*,
607 F.Supp.2d 701 (M.D. Pa. 2009).............................................25, 26
In re: *Domestic Drywall Antitrust Litigation*,
13-MD-2437, 2016 WL 2941114, (E.D. Pa., May 20, 2016)....24, 25, 30
In re: *National Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Lit.*, 375 F.Supp.3d (N.D. Cal. 2019),
*aff'd* 958 F.3d 1239 (9th Cir. 2020).............................................13, 28

In re: *Philadelphia Newspapers, LLC*,
No. 09-11204SR, 2009 WL 3242292 (Bankr. E.D. Pa., Oct. 8, 2009), *rev'd in part*, 418 B.R. 548 (E.D. Pa. 2009), *aff'd,* 599 F.3d 298 (3d Cir. 2010) .................................................... 13
*J.B.* ex rel. *Benjamin v. Fassnacht*,
801 F.3d 336 (3d Cir. 2015) ........................................................23, 26
*Johnson v. Alldredge*,
488 F.2d 820 (3d Cir.1973) ........................................................... 23
*Johnson v. National Collegiate Athletic Ass'n*,
2021 WL 3771810 (E.D. Pa. Aug. 25, 2021) ................................10, 15
*Joyce v. Maersk Line Ltd.*,
876 F.3d 502 (3d Cir. 2017) .......................................................... 14
*Katz v. Carte Blanche Corp.*,
496 F.2d 747 (3d Cir.) ...........................................................*Passim*
*Kavanagh v. Trustees of Boston Univ.*,
440 Mass. 195 (2003) ....................................................................... 9
*Klapper v. Commonwealth Realty Trust*,
662 F. Supp. 235 (D. Del. 1987) ..................................................... 25
*Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*,
921 F.2d 21 (2d Cir. 1990) ............................................................ 26
*Knipe v. SmithKline Beecham*,
583 F.Supp.2d 553 (E.D. Pa. 2008) .....................................23, 25, 26
*Korellas v. Ohio State Univ.*,
121 Ohio Misc. 2d 16, (Ohio Ct. Cl. 2002) ........................................... 9
*Livers v. Nat'l Collegiate Athletic Ass'n*,
2018 WL 2291027 (E.D. Pa. May 17, 2018) ........................................ 9
*Max Daetwyler Corp. v. R. Meyer*,
575 F.Supp. 280 (E.D. Pa. 1983), *aff'd in part*, 762 F.2d 290 (3rd Cir. 1985) ....................................... 27
*McGillicuddy v. Clements*,
746 F.2d 76 (1st Cir. 1984) ............................................................ 25
*Microsoft Corp. v. Baker*,
137 S.Ct. 1702 (2017) ..................................................................... 19
*Miller v. SmithKline Beecham Corp.*,
2013 WL 6506570 (M.D. Pa. Dec. 12, 2013) ..................................... 31
*N.J. Protection & Advocacy, Inc. v. N.J. Dep't of Educ.*,
2008 WL 4692345 (D.N.J. Oct. 8, 2008) ........................................... 31

*National Collegiate Athletic Ass'n v. Alston*,
141 S.Ct. 2141 (2021) ............................................................ *Passim*
*National Collegiate Athletic Ass'n v. Board of Regents of the Univ. of Oklahoma*, 468 U.S. 85 (1984) .......................................... 12
*Northwestern Univ. & College Player's Ass'n*,
2015 WL 4882656 (Aug. 17, 2015) ................................................ 16
*O'Bannon v. National Collegiate Athletic Ass'n*,
802 F.3d 1049 (9th Cir. 2015) ................................................ 12, 21
*Onyeanusi v. Pan Am*,
952 F.2d 788 (3d Cir. 1992) ........................................................ 14
*Onyebuchim Onyeanusi v. Pan American World Airways, Inc.*,
767 F.Supp. 654 (E.D. Pa. 1990) ................................................... 14
*Phila. World Hockey Club, Inc. v. Phila. Hockey Club, Inc.*,
351 F.Supp. 457 (E.D. Pa. 1972) ................................................... 14
*Pub. Interest Research Grp. of N.J., Inc. v. Hercules, Inc.*,
830 F.Supp. 1549 (D.N.J. 1993) .................................................... 29
*Reese v. BP Expl. (Alaska) Inc.*,
643 F.3d 681 (9th Cir. 2011) ........................................................ 26
*Rensing v. Indiana State Univ. Board of Trustees*,
444 N.E.2d 1170 (Ind. 1983) .......................................................... 9
*Shephard v. Loyola Marymount Univ.*,
102 Cal.App.4th 837 (2002) ............................................................ 9
*State Comp. Ins. Fund v. Industrial Commission*,
135 Colo. 570 (1957) ....................................................................... 9
*Townsend v. State of California*,
191 Cal.App.3d 1530 (1987) ........................................................... 9
*United States v. Exide Corp.*,
2002 WL 992817 ............................................................................ 30
*Waldrep v. Texas Employers Ins. Ass'n*,
21 S.W.3d 692 (Tex. App. 2000) ...................................................... 9
*Yamaha Motor Corp., USA v. Calhoun*,
516 U.S. 199 (1996) ...................................................................... 22

STATUTES

26 U.S.C. § 501 ................................................................................. 2
28 U.S.C. § 1292 ........................................................................ 11, 18
29 U.S.C. § 201 ............................................................................... 20

29 U.S.C. § 259 .................................................................................. 21

RULES

FED. R. APP. PROC. 5 ......................................................................... 34
FED. R. APP. PROC. 26.1 ....................................................................... 2
FED. R. APP. PROC. 32 ......................................................................... 34

OTHER AUTHORITIES

16 Wright & Miller, FEDERAL PRACTICE AND PROCEDURE § 3930 (3d ed. 2020) ............................................................................................ 19
Dep't of Labor, FIELD OPERATIONS HANDBOOK §§ 10b24(a), 10b03(e) ... 20
*Mandatory Submission Of Advice*, NLRB GC Memo. 18-02 ................. 16
*Statutory Rights of Players at Academic Institutions (Student Athletes) Under the National Labor Relations Act*, NLRB GC Memo. 21-08 ..........................................................16, 17
*The Unfair Labor Practice Context*, NLRB GC Memo. 17-01 ............... 16

# SUMMARY OF PETITION

In this lawsuit, college student athletes seek to represent a class and collective of all college students who play any NCAA Division I sport, arguing that the Fair Labor Standards Act and parallel state laws require their schools and the NCAA to pay them wages for playing sport. In *Berger v. National Collegiate Athletic Ass'n*, 843 F.3d 285 (7th Cir. 2016), the Seventh Circuit rejected an identical claim at the pleading stage, "hold[ing] that student athletes are not employees and are not covered by the FLSA." *Id.* at 288. Besides the Seventh Circuit, federal and state courts over the past 65 years have consistently agreed that student athletes are not employees because they play sport.[1]

---

[1] *See, e.g.*, *Dawson v. Nat'l Collegiate Athletic Ass'n*, 250 F. Supp. 3d 401 (N.D. Cal. 2017) (rejecting FLSA claim at the pleading staft because scholarship football players not *ipso facto* employees); *Berger v. National Collegiate Athletic Ass'n*, 162 F. Supp. 3d 845 (S.D. Ind. 2016) (rejecting FLSA claim at the pleading stage because Division I athletes not *ipso facto* employees); *Kavanagh v. Trustees of Boston Univ.*, 440 Mass. 195, 199 (2003) ("a scholarship or other financial assistance does not transform the relationship between the academic institution and the student into any form of employment relationship"); *Korellas v. Ohio State Univ.*, 121 Ohio Misc. 2d 16, 19, (Ohio Ct. Cl. 2002) (football student athlete was not an employee); *Shephard v. Loyola Marymount Univ.*, 102 Cal.App.4th 837, 844–46 (2002) (student athlete not an "employee" for purpose of applying state antidiscrimination laws); *Waldrep v. Texas Employers Ins. Ass'n*, 21 S.W.3d 692, 701 (Tex. App.

The district court here declined to follow the Seventh Circuit (and other jurisdictions who have addressed the question over the decades) and declined to dismiss the action. *Johnson v. National Collegiate Athletic Ass'n*, No. 19-5230, — F.Supp.3d —, 2021 WL 3771810 (E.D. Pa. Aug. 25, 2021).[2] Recognizing that it was charting a new path on a legal question settled for decades, it certified under 28 U.S.C. § 1292(b) this question from its ruling:

---

2000) (rejecting argument that football student athlete was an employee of his school); *Townsend v. State of California*, 191 Cal.App.3d 1530, 1537 (1987) (holding "as a matter of law" that a student athlete "was not an employee" of his university for purposes of the state Tort Claims Act); *Rensing v. Indiana State Univ. Board of Trustees*, 444 N.E.2d 1170, 1175 (Ind. 1983) ("the appellant shall be considered only as a student athlete and not as an employee within the meaning of the Workmen's Compensation Act."); *Coleman v. Western Michigan University*, 125 Mich. App. 35, 44 (1983) ("[W]e conclude that the WCAB did not err in finding that our Plaintiff was not an 'employee' of defendant within the meaning of the act."); *State Comp. Ins. Fund v. Industrial Commission*, 135 Colo. 570, 572-74 (1957) (rejecting workers' compensation claim on the ground that student athlete was not an employee).

The sole possible exception is a single ruling in an earlier Eastern District of Pennsylvania case declining to dismiss an FLSA claim at the pleading stage. *Livers v. Nat'l Collegiate Athletic Ass'n*, No. CV 17-4271, 2018 WL 2291027 (E.D. Pa. May 17, 2018). The district court never definitively ruled because the case was voluntarily dismissed without settlement, and the question never reached this Circuit.

[2] A copy of this ruling is attached as Appendix B.

> "Whether NCAA Division I student athletes can be employees of the colleges and universities they attend for purposes of the Fair Labor Standards Act solely by virtue of their participation in interscholastic athletics." (ECF 97, p. 1.)[3]

This Circuit should address the issue before the parties have to litigate a class and collective action involving over 200,000 college students who played sport at Division I schools over the past four years.[4]

This issue, to borrow a cliché, is 'ripped from the headlines.'[5] The popular press has been awash with discussions about 'paying' student athletes[6] ever since last term's Supreme Court ruling in *National*

---

[3] The district court's order certifying an interlocutory appeal (ECF 97) was entered on December 28, 2021. This Petition was filed 10 days later. A copy of the certifying order is attached as Appendix A.

[4] In any given year, approximately 170,000 students play in Division I sports. *See* https://www.ncaa.org/our-division-i-students.

[5] LAW360—a widely-read legal new service—identified this case as one of the five most significant sports-related lawsuits pending nationally. Zachary Zagger, Sports & Betting Cases To Watch In 2022, LAW360 (Jan. 3, 2022) (https://www.law360.com/articles/1445713/sports-betting-cases-to-watch-in-2022?ts_pk=aeed14c4-ab2b-4060-9f2d-9dfa6cbc7078&utm_source=user-alerts&utm_medium=email&utm_campaign)

[6] In just the 10 days between the district court's certification order and this Petition, *see, e.g.,* Darren Heitner, *Maine To Consider NIL Law And Classifying College Athletes As Employees*, ABOVE THE LAW (Jan. 5, 2022) (https://abovethelaw.com/ 2022/01/maine-to-consider-nil-law-and-classifying-college-athletes-as-employees/); Jason Kelly, *The (Next) Line That Can't Be Crossed*, NOTRE DAME MAGAZINE (Winter

*Collegiate Athletic Ass'n v. Alston*, 141 S.Ct. 2141 (2021). *Alston* held that the NCAA's "revered tradition of amateurism" (*National Collegiate Athletic Ass'n v. Board of Regents of the Univ. of Oklahoma*, 468 U.S. 85, 120 [1984]) did not insulate from antitrust scrutiny NCAA bylaws that regulated certain education-related payments to student athletes.

*Alston* did not undermine in the slightest the continuing viability of the Seventh Circuit's *Berger* decision. Notably, *Alston* did not even mention *Berger*, and can hardly be taken to reverse, limit, disapprove or criticize it. Indeed, the Ninth Circuit, in the ruling affirmed by *Alston* endorsed the principle that student athletes do not

---

2021-22; available online Jan. 3, 2022) (https://magazine.nd.edu/stories/the-next-line-that-cant-be-crossed/); Zachary Zagger, After Chaotic 2021, NCAA Faces Reckoning On Athlete Rights, Law360 (Jan. 3, 2022) (https://www.law360.com/articles/1446564/after-chaotic-2021-ncaa-faces-reckoning-on-athlete-rights?ts_pk=aeed14c4-ab2b-4060-9f2d-9dfa6cbc7078&utm_source=us); Ralph D. Russo, *For NCAA, year of upheaval leads to need for transformation*, THE SACRAMENTO BEE (Dec. 31, 2021) (https://www.sacbee.com/news/nation-world/national/article256942512.html); Pete Mundo, *Texas Tech Megabooster Suggests Revenue Sharing Plan for College Athletes*, HEARTLAND COLLEGE SPORTS (Dec. 29, 2021) (https://www.heartlandcollegesports.com/2021/12/29/texas-tech-megabooster-suggests-revenue-sharing-plan-for-college-athletes/); Michael McCann, *Top 5 Sports Law Controversies Of 2021 Traveled Far Beyond Sports*, SPORTICO (Dec. 29, 2021) (https://www.sportico.com/law/analysis/2021/supreme-court-ruling-1234648352/).

receive "'unlimited payments *unrelated to education*, akin to salaries seen in professional sports leagues.'" In re *Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Lit.*, 958 F.3d 1239, 1258 (9th Cir. 2020) (*quoting and affirming* 375 F.Supp.3d at 1083) (emphasis added). *See also O'Bannon v. National Collegiate Athletic Ass'n*, 802 F.3d 1049, 1053 (9th Cir. 2015) ("[N]ot paying student-athletes is *precisely what makes them amateurs*.") (emphasis in original). *Alston* praised the district court's care in crafting a remedy that "*would not blur the distinction between college and professional sports*" (*Alston*, 141 S.Ct. at 2164 [emphasis added]) and left undisturbed numerous statements in the lower court opinions erecting a firewall between defraying the costs of education for student athletes and paying them to play sport. Justice Kavanaugh alone criticized this firewall, in a concurrence that no other justice joined. *See Alston*, 141 S.Ct. at 2168-69.

The district court here went astray when it assumed that *Alston*'s criticism of the force of "amateurism" for *antitrust* purposes called into question *Berger*'s reliance on "amateurism" for *employment* purposes. Because *Berger* does not conflict with any decision from this

Circuit, it was entitled to "most respectful consideration" by the district court. *Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1123 (7th Cir. 1987).[7] Instead, it got 'short shrift.' When the district court combined its assumption that *Alston* undermined *Berger* with Justice Kavanaugh's concurrence, the district court was led expressly to "reject" Petitioners' argument that the district court should follow the Seventh Circuit absent contrary instruction from this Circuit. *Johnson*, 2021 WL 3771810, *5-6.

---

[7] This principle is widely followed in this Circuit. Decisions from other circuits that do not conflict with Third Circuit precedent "should [be] regard[ed] as '*highly persuasive*.'" *Onyebuchim Onyeanusi v. Pan American World Airways, Inc.*, 767 F.Supp. 654, 655 n.1 (E.D. Pa. 1990), *aff'd sub nom. Onyeanusi v. Pan Am*, 952 F.2d 788 (3d Cir. 1992) (emphasis added) (quoting 1B J. Moore, J. Lucas & T. Currier, MOORE'S FEDERAL PRACTICE ¶ 0.402[1] [2d ed. 1988]). They are at a minimum "entitled to *serious consideration*." *In re Philadelphia Newspapers, LLC*, No. 09-11204SR, 2009 WL 3242292, at *8 & n.2 (Bankr. E.D. Pa., Oct. 8, 2009) (citing *Onyeanusi*), *rev'd in part*, 418 B.R. 548 (E.D. Pa. 2009), *as amended* (May 7, 2010), *aff'd*, 599 F.3d 298 (3d Cir. 2010) (emphasis added). *Accord*, *Phila. World Hockey Club, Inc. v. Phila. Hockey Club, Inc.*, 351 F.Supp. 457, 461 (E.D. Pa. 1972) ("Although decisions in other circuits or other districts are not binding, they are entitled to 'serious consideration' by a federal district court."). *Cf.* *Joyce v. Maersk Line Ltd.*, 876 F.3d 502, 512 (3d Cir. 2017) (when the Third Circuit "is in disagreement with every other circuit to consider a question, it can be wise to reconsider our prior reasoning.") (*en banc*); *Bastardo-Vale v. Attorney General United States*, 934 F.3d 255, 267 (3d Cir. 2019) (following *Joyce*).

If this Circuit does not grant interlocutory appeal, the parties may have to litigate through trial a class and collective action covering more 200,000 Division I student athletes playing in any sport over the past four years before the district court's legal error can reach this Circuit. Leaving the district court's ruling in appellate limbo could open the floodgates to a torrent of copy-cat lawsuits seeking pay for student athletes. This is something the Supreme Court had no intention of inspiring.

It may have already started. One month after the district court's order, the General Counsel of the National Labor Relations Board reinstated a long-rejected position that college student athletes are protected by federal labor laws. In 2015, the Board reversed a Regional Director finding that college football players were employees entitled to organize under the National Labor Relations Act, declining to assert jurisdiction over college student athletes. *Northwestern Univ. & College Player's Ass'n*, 2015 WL 4882656 (Aug. 17, 2015). Undeterred by the Board's holding, a year and one-half later the General Counsel issued a memorandum to staff brushing the Board's decision aside on procedural grounds and taking a contrary position. *See General Counsel's Report*

*Report On The Statutory Rights Of University Faculty and Students In The Unfair Labor Practice Context*, NLRB GC MEMO. 17-01, pp. 16-23 (Jan. 31, 2017). That memorandum was withdrawn after less than a year. *Mandatory Submission Of Advice*, NLRB GC MEMO. 18-02, pp. 4-5 (Dec. 1, 2017). But a month after the district court's ruling here, the General Counsel again reversed course. *Statutory Rights of Players at Academic Institutions (Student Athletes) Under the National Labor Relations Act*, NLRB GC MEMO. 21-08 (Sept. 29, 2021).

The General Counsel gave even less respect to *Berger* than the district court, not mentioning *Berger* at all.[8] Nor did the General Counsel make any attempt to distinguish the many cases over the past 65 years holding that student athletes are not *ipso facto* employees of the schools they attend. But her memorandum did discuss *Alston*, and in particular the *dicta* in Justice Kavanaugh's concurrence, speculating

---

[8] The Seventh isn't the only circuit the General Counsel ignored. The memorandum summarily concludes that "[b]ecause Players at Academic Institutions perform services for, and subject to the control of, the NCAA and their athletic conference, in addition to their college or university, in appropriate circumstances I will consider pursuing a joint employer theory of liability"—even though the Ninth Circuit squarely rejected that theory in *Dawson v. National Collegiate Athletic Ass'n*, 932 F.3d 905 (9th Cir. 2019). *See* NLRB GC MEMO. 21-08, p. 9 n.34.

that *Alston* "is likely a precursor to more changes to come in college athletics." NLRB GC MEMO. 21-08, p. 5. The General Counsel views *Alston* as giving student athletes "freedom to engage in far-reaching and lucrative business enterprises [that] makes . . . [them] much more similar to professional athletes who are employed by a team to play a sport" (*Id.*, p. 6), even though the Supreme Court expressly affirmed a remedy it believed "would *not* blur the distinction between college and professional sports." *Alston*, 141 S.Ct. at 2164 (emphasis added).

About a month and one-half after issuing the new memorandum, General Counsel Jennifer Abruzzo appeared on a podcast in which she expressed disappointment no one had filed a charge on behalf of student athletes and invited someone to do so in order to "jump start" the process. She also stated she was "confident" the Board would side with her on the issue (notwithstanding the precedent of *Northwestern Univ.*).[9] She got what she asked for. A non-profit corporation (formed two weeks after she issued the new memorandum) ostensibly dedicated to "nationwide advocacy for the rights of college basketball players" (but

[9] The podcast may be found at https://theendofsport.podbean.com/e/episode-89-the-nlrb-memo-with-jennifer-abruzzo/.

whose sole officer is a corporate executive[10]) filed a charge on behalf of itself, but not joined by even one student athlete. *See The Nat'l Collegiate Athletic Ass'n*, No. 25-CA-286101 (NLRB Region 25; filed Nov. 10, 2021).[11]

Section 1292(b) gives this Circuit discretion to entertain an interlocutory appeal involving (1) a controlling question of law (2) as to which there is substantial ground of difference of opinion, (3) when immediate appeal could materially advance the termination of litigation. *See, e.g., Microsoft Corp. v. Baker*, 137 S.Ct. 1702, 1708 (2017); 16 Wright & Miller, FEDERAL PRACTICE AND PROCEDURE § 3930 (3d ed. 2020). The district court's ruling endorses a novel interpretation of precedent with repercussions far beyond this one lawsuit. As reversal of the district court would lead to outright dismissal of this action—or at least dramatically (in the eyes of the district court) "simplify both

---

[10] *See* https://businesssearch.sos.ca.gov/Document/RetrievePDF?Id=04799932-31543052; https://businesssearch.sos.ca.gov/Document/RetrievePDF?Id=04799932-31646410.

[11] A contemporaneous press report quotes the officer of the complainant stating that he was inspired by Mr. Abruzzo's podcast to file the charge. *See* Daniel Libit and Michael McCann, *Unfair Labor Charge Against NCAA May Offer NLRB a New Test Case*, SPORTICO (Nov. 16. 2021) (https://www.sportico.com/leagues/ college-sports/2021/ncaa-nlrb-unfair-labor-charge-1234646629/amp/)

discovery and any eventual trial" (ECF 97, p. 8)—this Circuit should grant this petition in the interest of justice.

# STATEMENT OF FACTS AND PROCEDURAL HISTORY

This lawsuit was filed by three current, and three former, college student athletes.[12] They sued their own schools (the "Attended Schools"), the National Collegiate Athletic Association ("NCAA") and 20 other universities in this Circuit (the "Non-Attended Schools"[13]) under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.,* and parallel state laws, for minimum wages for the time they devoted to playing sport. They sought certification of a collective

[12] The student athletes are Alexa Cooke (tennis, Lafayette College), Stephanie Kerkeles (swimming and diving, Fordham University) and Nicholas Labella (baseball, Fordham). The former student-athletes are Ralph "Trey" Johnson (football, Villanova University, 2013-17); Claudia Ruiz (tennis, Sacred Heart University, 2014-18); and Jacob Willebeek-Lemair (soccer, Cornell University, 2017-18).

[13] The Non-Attended Schools are: Bucknell University; Drexel University; Duquesne University; Farleigh Dickinson University; La Salle University; Lehigh University; Monmouth University; Penn State University; Princeton University; Rider University; Robert Morris University; Rutgers, The State University of New Jersey; Saint Francis University; Saint Joseph's University; Seton Hall University; St. Peter's University; Temple University; University of Delaware; University of Pennsylvania; and University of Pittsburgh.

action of all student athletes in all sports in all NCAA Division I[14] school, and a Rule 23 defendant class of those schools. (ECF 2.)

The Attended Schools moved to dismiss the suit on two grounds: First, student athletes are not *ipso facto* employees under the FLSA and parallel state laws. Second, defendants have a complete defense to liability under the FLSA based on the Department of Labor's longstanding interpretation that "activities in connection with . . . interscholastic athletics . . . do not result in an employer-employee relationship between the student and the school or institution." *See* 29 U.S.C. § 259(a); Dep't of Labor, FIELD OPERATIONS HANDBOOK §§ 10b24(a), 10b03(e). (ECF 25, 25-1.)

The NCAA and Non-Attended Schools joined in the Attended Schools' motion. (ECF 26-1, p. 7.) They also moved separately to urge a further ground for dismissal as to them: that the first amended

---

[14] *See, e.g., O'Bannon*, 802 F.3d at 1053 ("The NCAA has grown to include some 1,100 member schools, organized into three divisions: Division I, Division II, and Division III. Division I schools are those with the largest athletic programs—schools must sponsor at least fourteen varsity sports teams to qualify for Division I—and they provide the most financial aid to student-athletes. Division I has about 350 members.").

complaint failed to state a plausible claim of joint employment. (ECF 26, 26-1.)

The district court denied the Attended Schools motion in its entirety (ECF 64, 65), and the NCAA's separate motion. (*See* ECF 64, pp. 26-27, 65.) It granted the separate motion brought by the Non-Attended Schools (*see* ECF 64, pp. 26-27) and dismissed them from the action. (ECF 65.) Then it granted § 1292(b) certification of its ruling on the first motion (ECF 97) but denied certification on the second (ECF 99). Although § 1292(b) certification "applies to the *order* certified to the court of appeals, and is not tied to the particular question formulated by the district court[,]" *Yamaha Motor Corp., USA v. Calhoun*, 516 U.S. 199, 205 (1996) (emphasis added), the district court identified the following issue in its ruling as meeting the statutory criteria for interlocutory review:

> "Whether NCAA Division I student athletes can be employees of the colleges and universities they attend for purposes of the Fair Labor Standards Act solely by virtue of their participation in interscholastic athletics." (ECF 97, p. 1.)

# ARGUMENT

"[A] non-final order may only be certified for interlocutory appeal if the court determines it: (1) involves a 'controlling question of law,' (2) for which there is 'substantial ground for difference of opinion,' and (3) which may 'materially advance the ultimate termination of the litigation' if appealed immediately." *J.B.* ex rel. *Benjamin v. Fassnacht*, 801 F.3d 336, 339 n.8 (3d Cir. 2015) (*quoting Katz v. Carte Blanche Corp.*, 496 F.2d 747, 754 [3d Cir.], *cert. denied*, 419 U.S. 885 [1974], and *Knipe v. SmithKline Beecham*, 583 F.Supp.2d 553, 598-99 [E.D. Pa. 2008]). "Section 1292(b) was the result of dissatisfaction with the prolongation of litigation" and the drafters "referred specifically to cases in which a long trial results from a pretrial order erroneously overruling a defense going to the right to maintain the action." *Katz*, 496 F.2d at 753-54. "[T]he purpose of § 1292(b) [is] to permit decision of legal issues as to which there is considerable question without requiring the parties first to participate in a trial that may be unnecessary." *Johnson v. Alldredge*, 488 F.2d 820, 823 (3d Cir.1973), *cert. denied sub nom., Cronrath v. Johnson*, 419 U.S. 882 (1974). It advances a policy of

"avoidance of possibly wasted trial time and litigation expense." *Katz,* 496 F.2d at 756.

As the district court ruled, it's order satisfies all these criteria (ECF 97.)

## I.
## THE DISTRICT COURT'S ORDER PRESENTS A CONTROLLING QUESTION OF LAW.

"[T]he Third Circuit interprets the standard for 'controlling issue of law' more broadly than others." *In re: Domestic Drywall Antitrust Litigation*, No. 2437 13-MD-2437, 2016 WL 2941114, at *1, n.2 (E.D. Pa., May 20, 2016). A controlling issue includes "at the very least every order which, if erroneous, would be reversible error on final appeal," as well as questions that are "serious to the conduct of the litigation, either practically or legally." *Katz,* 496 F.2d at 755.

The district court's ruling "that the Complaint plausibly alleges that Plaintiffs are employees of the [Attended Schools] for purposes of the FLSA" (ECF 55, p. 30) indisputably presents a controlling question of law, as reversal would lead to dismissal of the entire action, or at least "simplify both discovery and any eventual trial" (ECF 97, p. 8). *See, e.g., Katz,* 496 F.2d at 755; *Klapper v. Commonwealth Realty*

*Trust*, 662 F. Supp. 235, 236 (D. Del. 1987) (noting that questions that would terminate a case are "particularly well suited for an interlocutory appeal").

## II.
## THE SEVENTH CIRCUIT, NORTHERN DISTRICT OF CALIFORNIA, AND DISTRICT OF INDIANA ALL REACHED THE OPPOSITE CONCLUSION FROM THE EASTERN DISTRICT OF PENNSYLVANIA. SUBSTANTIAL GROUNDS FOR DIFFERENCE OF OPINION EXIST.

"In the Third Circuit, there is substantial ground for difference of opinion 'if there is genuine doubt or conflicting precedent as to the correct legal standard.'" *In re: Domestic Drywall Antitrust Litigation*, 2016 WL 2941114, at *3 (*quoting Bradburn Parent Teacher Store, Inc. v. 3M*, No. 02-cv-7676, 2005 WL 1819969 at *4 [E.D. Pa. Aug. 2, 2005]). "[G]enuine doubt as to the correct legal standard" exists when an order addresses "difficult and pivotal questions of law not settled by controlling authority." *Knipe*, 583 F. Supp. 2d at 599 (*quoting McGillicuddy v. Clements*, 746 F.2d 76, 76 n. 1 [1st Cir. 1984]). *See also In re Chocolate Confectionary Antitrust Litigation*, 607 F.Supp.2d 701, 705-706 (M.D. Pa. 2009) ("A substantial ground for difference of opinion exists when controlling authority fails to resolve a pivotal matter.") "[T]he absence of controlling law on a particular issue can constitute

substantial grounds," as can "[c]onflicting and contradictory opinions." *Knipe*, 583 F. Supp. 2d 553, 600 (E.D. Pa. 2008) (*cited with approval in J.B.* ex rel. *Benjamin*, 801 F.3d at 339 n.8). *Accord In re Chocolate Confectionary Antitrust Litigation*, 607 F.Supp.2d at 706. *See also, Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 688 (9th Cir. 2011) ("[W]hen novel legal issues are presented, on which fair-minded jurists might reach contradictory conclusions, a novel issue may be certified for interlocutory appeal without first awaiting development of contradictory precedent."); *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 921 F.2d 21, 25 (2d Cir. 1990) (explaining there are substantial grounds for difference of opinion when "the issues are difficult and of first impression"). The mere absence of controlling law on a particular issue can constitute substantial ground for a difference of opinion sufficient to warrant interlocutory appeal. *See Bellas v. CBS, Inc.*, 221 F.3d 517, 518 (3d Cir. 2000) ("This matter has been certified for interlocutory appeal to address a question of first impression in this court . . . ."). Conflicting opinions either within the Circuit, or without, also create "genuine doubt." *See Max Daetwyler Corp. v. R. Meyer*, 575 F.Supp. 280, 283

(E.D. Pa. 1983) (certifying question based on split among district courts nationally), *certified question answered*, 762 F.2d 290 (3rd Cir. 1985).

This Circuit has not spoken on the question identified by the district court. But the Seventh Circuit has—directly—when it held "as a matter of law, that student athletes are not employees under the FLSA." *Berger*, 843 F.3d 294. The Northern District of California, when presented with the same question absent guidance from its own Ninth Circuit, found the Seventh Circuit's reasoning "persuasive" and held that "there is simply no legal basis for finding [student athletes] to be "employees" under the FLSA." *Dawson*, 250 F.Supp.3d 403, 408. That the district court—under the same circumstances as the Northern District of California—chose not to follow the Seventh Circuit, demonstrates both "genuine doubt" and "conflicting precedent" on the issue. The district court itself acknowledged this quandry in its certification order. (*See* ECF 97, p. 7.)

Plaintiffs may argue there is a difference between the district court's ruling and the decisions in *Berger* and *Dawson* because they were decided before *Alston*. But *Alston* does not undermine in the

slightest the continuing viability of *Berger* or *Dawson*.[15] By explicitly distinguishing education-related financial support for student athletes from direct compensation for playing sport, *Alston* actually supports the longstanding principle that the economic reality of student athletics is—and should continue to be—that student athletes do not receive "'unlimited payments *unrelated to education*, akin to salaries seen in professional sports leagues'" from their schools. *NCAA GIA Litig. II*, 958 F.3d at 1258 (*quoting* 375 F. Supp. 3d at 1083) (emphasis added). Indeed, *Alston* praises the district court's care in crafting a remedy that "*would not blur the distinction between college and professional sports*" (*Alston*, 141 S.Ct. at 2164 [emphasis added]), and leaves undisturbed numerous statements in the lower court opinions erecting a jurisprudential firewall between defraying the costs of education for student athletes and paying them to play sport.

To be clear, this case has nothing to do with the sort of "education-related benefits" that *Alston* addressed. Rather, it seeks "compensation related to athletic performance"—a subject of NCAA rules that the

---

[15] *Alston* does not reverse, limit, disapprove or criticize *Berger* or *Dawson* in any fashion. It does not even mention *Berger* or *Dawson* once, and can hardly be taken as a repudiation of either holding.

lower courts in *Alston* "refused to disturb," and which rulings "the student-athletes [did] not challenge" before the Supreme Court. *Alston*, 141 S.Ct. at 2147. The district court's reliance on *Alston* only deepens the "genuine doubt" and "conflicting precedent" as to the correct legal standard.[16]

## III.
## IMMEDIATE APPEAL FROM THE ORDER WILL MATERIALLY ADVANCE THE ULTIMATE TERMINATION OF THIS LAWSUIT—AND ADDRESS A SIGNIFICANT UNRESOLVED QUESTION IN THIS CIRCUIT.

"The requirement that an appeal may materially advance the ultimate termination of the litigation is closely tied to the requirement that the order involve a controlling question of law." *F.T.C. v. Wyndham Worldwide Corp.*, 10 F. Supp. 3d 602, 635 (D.N.J. 2014) (*quoting Pub. Interest Research Grp. of N.J., Inc. v. Hercules, Inc.*, 830 F.Supp. 1549, 1557 [D.N.J. 1993], *aff'd*, 799 F.3d 236 [3d Cir. 2015]). Section 1292(b) "is designed to allow for early appeal of a legal ruling when resolution of the issue may provide more efficient disposition of the litigation." *Ford*

[16] Justice Kavanaugh's criticism of the Ninth Circuit's firewall between restrictions of paying student athletes to play sport, and other forms of outside compensation or compensation for education-related expenses (*see* ECF 55, p. 12) appears only in his concurrence, not the majority opinion.

*Motor Credit Co. v. S.E. Barnhart & Sons, Inc.*, 664 F.2d 377, 380 (3d Cir. 1981). "In considering whether an appeal would materially advance the ultimate termination of litigation, 'courts have focused on whether an appeal would (1) eliminate the need for trial, (2) eliminate complex issues so as to simplify the trial, or (3) eliminate issues to make discovery easier and less costly.'" *In re: Domestic Drywall Antitrust Litigation*, 2016 WL 2941114, at *4 (*quoting United States v. Exide Corp.*, No. 00-cv-3057, 2002 WL 992817, at *2 [E.D. Pa. May 15, 2002). The key consideration in the third element of § 1292(b) is "the avoidance of harm" to the petitioning party from wasted trial time and litigation expenses. *Katz*, 496 F.2d at 756.

"It is not required that a reversal of the Court's Order would end the litigation." *In re: Domestic Drywall Antitrust Litigation*, 2016 WL 2941114, at *4 (*citing Katz*, 496 F.2d at 755). "Certification is more likely to materially advance the litigation where the appeal occurs early in the litigation, before extensive discovery has taken place and a trial date has been set." *N.J. Protection & Advocacy, Inc. v. N.J. Dep't of Educ.*, No. 07-2978 (MLC), 2008 WL 4692345, at *3 (D. N.J. Oct. 8, 2008).

Here, immediate appeal not only "may" materially advance the ultimate termination of the lawsuit; it will do so. If this Circuit adopts the reasoning of the Seventh, this case will be over. If it splits with the Seventh, and sets forth a governing test, it will simplify discovery, motion practice, and trial. *E.g.*, *Miller v. SmithKline Beecham Corp.*, No. 13-2382, 2013 WL 6506570, *3 (M.D.Pa. Dec. 12, 2013) (certifying issue for interlocutory appeal where the scope of discovery as well as the time and expense to reach ultimate termination of case may be impacted by appellate ruling on a controlling issue of law).

Once satisfied that the criteria in § 1292(b) are satisfied, this Circuit turns to "the uniqueness, exceptionality, or extraordinary importance of the question of law involved" to decide whether to grant interlocutory appeal. *Katz*, 496 F.2d at 755. As discussed above (*supra*, pages 10-11), the question certified by the district court is one 'ripped from the headlines' and largely determinative of the claims raised in one of the largest wage-and-hour class and collective action pending in the nation, potentially effecting more than 200,000 student athletes at approximately 350 NCAA Division I schools. Given the stakes raised in this suit, this Circuit will almost certainly be asked to address these

legal questions by one side or the other on appeal from a final judgment. There is little chance that leaving them for later will result in conserving judicial resources at the appellate level. But addressing them now will doubtlessly conserve judicial (and party) resources at the district court level. This Circuit's ruling could eliminate (or, as the district court concluded, drastically streamline) this case, and at the very least would settle open legal questions that may create a more favorable environment for settlement.

# CONCLUSION

Petitioners respectfully request this Circuit grant interlocutory appeal of the district court's ruling.

Dated: January 7, 2022

CONSTANGY, BROOKS, SMITH & PROPHETE LLP

By: ___ *s/Steven Bernard Katz*__________

Steven B. Katz
2029 Century Park East, Suite 1100
Los Angeles, CA 90067
skatz@constangy.com
Tel: (310) 909-7775
Fax: (424) 465-6630

John E. MacDonald
989 Lenox Drive
Suite 206 (2nd Floor)
Lawrenceville, New Jersey 08648
jmacdonald@constangy.com
Telephone: (609) 454-0096
Facsimile: (609) 844-1102

COUNSEL FOR PETITIONERS NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, CORNELL UNIVERSITY, FORDHAM UNIVERSITY, LAFAYETTE COLLEGE, SACRED HEART UNIVERSITY AND VILLANOVA UNIVERSITY

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of FED. R. APP. PROC. 5(c)(1) because this brief contains fewer than 5,000 words, excluding the parts exempted by FED. R. APP. PROC. 32(f).

This brief complies with the typeface requirements of FED. R. APP. PROC. 32(a)(5)(A) because this brief has been prepared in 14-point, proportionally spaced, Century font, using Microsoft Word 360.

By: ____*s/Steven Bernard Katz*___________
COUNSEL FOR PETITIONERS

# CERTIFICATE OF SERVICE

I certify that on January 7, 2022, the foregoing document was transmitted to the Clerk of the United States Court of Appeals for the Third Circuit, via the Court's CM/ECF Document Filing System, and electronically served via email to the following counsel of record for Plaintiffs-Respondents:

Michael J. Willemin (MWillemin@wigdorlaw.com)

Renan F. Varghese (RVarghese@wigdorlaw.com)

Taylor Crabill (TCrabill@wigdorlaw.com)

Paul McDonald (paul@plmcdonaldlaw.com)

By: ___ *s/Steven Bernard Katz*__________
COUNSEL FOR PETITIONERS

# Appendix A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RALPH "TREY" JOHNSON, ET AL., individually and on behalf of all persons similarly situated<br><br>v.<br><br>NATONAL COLLEGIATE ATHLETIC ASSOCIATION, ET AL. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>: | CIVIL ACTION<br><br><br><br><br><br><br>NO. 19-5230 |

**ORDER-MEMORANDUM**

**AND NOW**, this 22nd day of December, 2021, upon consideration of the "Corrected Notice of Motion and Motion of the Attended Schools to Certify Interlocutory Appeal of Ruling Denying Their Motion to Dismiss (ECF 55-56)" (Docket No. 69), all documents filed in connection therewith, and the Hearing held on November 4, 2021, **IT IS HEREBY ORDERED** that the Motion is **GRANTED,** and the following issue **IS HEREBY CERTIFIED** for interlocutory appeal:

> Whether NCAA Division I student athletes can be employees of the colleges and universities they attend for purposes of the Fair Labor Standards Act solely by virtue of their participation in interscholastic athletics.

## I. BACKGROUND

The First Amended Complaint ("Complaint")[1] alleges that student athletes who attend colleges and universities in Division I of the National Collegiate Athletic Association (NCAA) and who engage in Division I interscholastic athletic activity for those colleges and universities

---

[1] Plaintiffs filed a Second Amended Complaint on September 23, 2021 (Docket No. 67), after we issued the Order and Memorandum that are the subject of the instant Motion. The Second Amended Complaint does not alter any of the claims alleged against the ASD in the Complaint. Accordingly, we do not address the Second Amended Complaint in this Order-Memorandum.

that is unrelated to academics are student employees similar to students engaged in work study programs and should be paid for the time they spend in NCAA Division I interscholastic athletics as if they were work study students. The Complaint asserts claims for violation of the Fair Labor Standards Act ("FLSA"), the Pennsylvania Minimum Wage Act, 43 Pa. Stat. § 333.101, et seq. (the "PMWA"), the New York Labor Law, N.Y. Lab. Law § 191, et seq. ("NYLL"), and the Connecticut Minimum Wage Act, C.G.S.A. §§ 31-58, et seq. ("CMWA"). (Compl. Counts I-II, IV-V, VII.) The Complaint also asserts claims for unjust enrichment under Pennsylvania, New York, and Connecticut common law against all Defendants. (Id. Counts III, VI, VIII.) The Complaint seeks the approval of an FLSA collective and classes to pursue the Pennsylvania, New York, and Connecticut law claims.

On August 25, 2021, we denied the Attended Schools Defendants' ("ASD") Motion to Dismiss. The ASD moved to dismiss Plaintiffs' FLSA and state statutory law claims[2] as against them on the ground that the Complaint does not allege facts that would establish that Plaintiffs are their employees, which is a requirement for bringing a claim under the FLSA and the relevant state statutes See Johnson v. The Nat'l Collegiate Athletic Assoc., __ F. Supp. 3d __, Civ. A. No. 19-5230, 2021 WL 3771810, at *5 (E.D. Pa. Aug. 25 2021) (citing Razak v. Uber Techs. Inc., 951 F.3d 137, 143 (3d Cir. 2020), cert. denied, 141 S. Ct. 2629 (2021)). The ASD argued that Plaintiffs could not be their employees for three reasons: (1) student athletes such as Plaintiffs are amateurs; (2) the Department of Labor has determined that interscholastic athletes are not employees for purposes of the FLSA; and (3) the Complaint does not plausibly allege that Plaintiffs are employees pursuant to a multi-factor test used to determine whether individuals are employees.

[2] The ASD did not move to dismiss any of Plaintiffs' unjust enrichment claims.

We denied the Motion to Dismiss as to all three of these arguments. The ASD now ask us to certify the issue described above for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).[3]

## II. LEGAL STANDARD

"Generally, an order denying a dispositive motion is not immediately appealable because it is not a final judgment." Fair Hous. Rts. Ctr. in Se. Pa. v. Morgan Props. Mgmt. Co., LLC, Civ. A. No. 16-4677, 2018 WL 4489653, at *2 (E.D. Pa. Sept. 19, 2018) (citing In re Chocolate Confectionary Antitrust Litig., 607 F. Supp. 2d 701, 704 (M.D. Pa. 2009)). "However, district courts may certify a non-final order for interlocutory appeal under 28 U.S.C. § 1292(b)." Id. (citing In re Chocolate Confectionary, 607 F. Supp. 2d at 704). "To certify a non-final order for interlocutory appeal, '[t]he order must (1) involve a controlling question of law, (2) offer substantial ground for difference of opinion as to its correctness, and (3) if appealed immediately, materially advance the ultimate termination of the litigation.'" Id. (quoting Katz v. Carte Blanche Corp., 496 F.2d 747, 754 (3d Cir. 1974) (en banc)); see also 28 U.S.C. § 1292(b); J.B. ex rel. Benjamin v. Fassnacht, 801 F.3d 336, 339 n.8 (3d Cir. 2015) (quoting Knipe v. SmithKline Beecham, 583 F.Supp.2d 553, 598-99 (E.D. Pa. 2008)). "However, '[t]he certification procedure is not mandatory; indeed, permission to appeal is wholly within the discretion of the courts, even if the criteria are present.'" Fair Hous. Rts. Ctr., 2018 WL 4489653, at *2 (quoting Bachowski v. Usery, 545 F.2d 363, 368 (3d Cir. 1976)).

---

[3] The ASD phrased this issue as follows in its Motion:

1. Are student-athletes ever *ipso facto*[3] employees of the schools for whom they compete under the Fair Labor Standards Act?
2. If so, under what circumstances are student athletes *ipso facto* considered employees of their schools?

Counsel for the ASD explained, during the November 4, 2021 Hearing, that they used *ipso facto* in this context to mean "[b]y the fact that they play sport." (11/4/21 Hr'g at 5.)

"The decision to certify an order for interlocutory review is only appropriate in 'exceptional circumstances and we should be mindful of the strong policy against piecemeal appeals when exercising our discretion.'" Id. (quoting U.S. ex rel. Nevyas v. Allergan, Inc., Civ. A. No. 09-432, 2015 WL 4064629, at *2 (E.D. Pa. July 2, 2015)) "'The Third Circuit has held that certification is to be used in exceptional cases where an immediate appeal would avoid protracted and expensive litigation.'" Id. (quoting Zygmuntowicz v. Hosp. Invs., Inc., 828 F. Supp. 346, 353 (E.D. Pa. 1993)). "'The party seeking interlocutory review has the burden of persuading the district court that exceptional circumstances exist that justify a departure from the basic policy of postponing appellate review until after the entry of final judgment.'" Id. (quoting Premick v. Dick's Sporting Goods, Inc., Civ. A. No. 06-530, 2007 WL 588992, at *1 (W.D. Pa. Feb. 20, 2007)).

## III. DISCUSSION

The ASD argue that certification of the two issues they have identified for interlocutory appeal would satisfy these criteria because (1) our August 25, 2021 Order and accompanying Memorandum present a "controlling question of law" that, if reversed by the Third Circuit would result in dismissal of this case; (2) the Order and Memorandum address questions over which there is "substantial ground for difference of opinion," because this Court's Order differs from the decisions of the United States Court of Appeals for the Seventh Circuit in Berger v. National Collegiate Athletic Association, 843 F.3d 285 (7th Cir. 2016) and the Northern District of California in Dawson v. National Collegiate Athletic Association, 250 F. Supp. 3d 401 (N.D. Cal. 2017); and 3) immediate review of the Order and Memorandum will "materially advance the

ultimate termination of the litigation" because, if the Order is reversed, it will end the litigation as to all defendants.[4] (ASD Mem. (Docket No. 69-1) at 2-3.)

A. Controlling Question of Law

"'An order involves a controlling question of law if either (1) an incorrect disposition would constitute reversible error if presented on final appeal or (2) the question is serious to the conduct of the litigation either practically or legally.'" Fair Hous. Rts. Ctr., 2018 WL 4489653, at *3 (quoting In re Chocolate Confectionary, 607 F. Supp. 2d at 705). However, "'[c]ertification to appeal [an] interlocutory [o]rder is inappropriate when the underlying order involve[s] mixed questions of law and fact because Section 1292(b) was not designed to secure appellate review of factual matters.'" Id. (alterations in original) (quoting In re Fasteners Antitrust Litig., Civ. A. No. 08-1912, 2012 WL 3194377, at *3 (E.D. Pa. Aug. 6, 2012)).

In order to state cognizable claims for violation of the FLSA, the PMWA, the NYLL, and the CMWA, the Complaint must plausibly allege that Plaintiffs are employees of the colleges and universities they attend. See Razak, 951 F.3d at 142 (noting that the minimum and overtime wage provisions of the FLSA and the PMWA require the plaintiffs to show that they are "'employees.'" (citing 29 U.S.C. §§ 203, 206-07; Dep't of Labor & Indus. v. Stuber, 822 A.2d 870, 873 (Pa. Commw. Ct. 2003), aff'd 859 A.2d 1253 (Pa. 2004))). Thus, our Order and Memorandum, which "conclude[d] that the Complaint plausibly alleges that Plaintiffs are employees of the ASD for purposes of the FLSA," Johnson, 2021 WL 3771810, at *15, involves a controlling question of law because an incorrect determination of this issue "would constitute reversible error if presented

[4] We note, again, that the ASD did not move to dismiss Plaintiffs' unjust enrichment claims and, accordingly, those claims would not be dismissed if the United States Court of Appeals for the Third Circuit were to accept the interlocutory appeal of this case and reverse our decision denying the ASD's Motion to Dismiss.

Case 2:19-cv-05230-JP Document 37 Filed 12/28/21 Page 6 of 22

on final appeal." Fair Hous. Rts. Ctr., 2018 WL 4489653, at *3. Moreover, our analysis of the ASD's argument in their Motion to Dismiss that Plaintiffs cannot be the employees of the colleges and universities they attend and for which they compete in NCAA Division I athletics simply because they are amateurs did not involve mixed questions of law and fact.[5] Accordingly, we conclude that our August 25, 2021 Order and Memorandum involves a controlling issue of law.

B. Substantial Ground for Difference of Opinion

"In the Third Circuit, there is substantial ground for difference of opinion if there is genuine doubt or conflicting precedent as to the correct legal standard." In re: Domestic Drywall Antitrust Litig., MDL No. 2437, 2016 WL 2941114, at *3 (E.D. Pa. May 20, 2016) (quotation and citation omitted). The ASD argue that there is conflicting precedent as to the correct legal standard because two of the four courts that have examined the question of whether NCAA Division I student athletes can be employees of the colleges and universities they attend for purposes of the FLSA solely by virtue of their participation in interscholastic athletics have found, as a matter of law, that they cannot. See Berger, 843 F.3d at 294 (7th Cir. 2016) (affirming district court's dismissal of putative FLSA collective action brought by former student athletes of the University of Pennsylvania against the NCAA and more than 120 Division I colleges and universities because "as a matter of law . . . student athletes are not employees and are not covered by the FLSA"); Dawson, 250 F. Supp. 3d at 408 (granting motion to dismiss putative class action lawsuit against the NCAA and the PAC-12 Conference under the FLSA and California law because "there is

[5] As we mentioned above, the ASD also argued in their Motion to Dismiss that Plaintiffs could not be their employees because the Department of Labor has determined that interscholastic athletes are not employees for purposes of the FLSA and because the Complaint does not plausibly allege that Plaintiffs are employees pursuant to a multi-factor test used to determine whether individuals are employees. Our analysis of these arguments in connection with our Order and Memorandum denying the ASD's Motion to Dismiss required thorough consideration of the factual allegations of the Complaint.

simply no legal basis for finding [NCAA Division I college football players] to be 'employees' under the FLSA"); c.f. Livers v. Nat'l Collegiate Athletic Assoc., Civ. A. No. 17-4271, 2018 WL 3609839, at *4 (E.D. Pa. July 26, 2018) (denying motion to dismiss FLSA claim brought against Villanova University and the NCAA by former student athlete who played on the Villanova football team because the amended complaint "plausibly states a willful FLSA violation sufficient to survive at the Motion to Dismiss stage"). We conclude, accordingly, that there is "conflicting precedent as to the correct legal standard" and, thus, that "there is substantial ground for difference of opinion" as to whether NCAA Division I student athletes can be employees of the colleges and universities they attend for purposes of the FLSA solely by virtue of their participation in interscholastic athletics. See Domestic Drywall, 2016 WL 2941114, at *3.

C. Material Advancement of this Litigation's Ultimate Termination

"In considering whether an [interlocutory] appeal would materially advance the ultimate termination of litigation, 'courts have focused on whether an appeal would (1) eliminate the need for trial, (2) eliminate complex issues so as to simplify the trial, or (3) eliminate issues to make discovery easier and less costly.'" Id. at *4 (quoting United States v. Exide Corp., Civ. A. No. 00-3057, 2002 WL 992817, at *2 (E.D. Pa. May 15, 2002)). "It is not required that a reversal of the Court's Order would end the litigation." Id. (citing Katz, 496 F.2d at 755 ). "Certification is more likely to materially advance the litigation where the appeal occurs early in the litigation, before extensive discovery has taken place and a trial date has been set." Katz v. Live Nation, Inc., Civ. A. No. 09-3740, 2010 WL 3522792, at *3 (D.N.J. Sept. 2, 2010) ) (citing Kapossy v. McGraw-Hill, Inc., 942 F. Supp. 996, 1004 (D.N.J. Oct. 4, 1996)).

As we mentioned above, the ASD did not move to dismiss Plaintiffs' state law unjust enrichment claims. Thus, an interlocutory appeal cannot eliminate the need for a trial in this case.

However, if the Third Circuit were to both reverse our decision that the Complaint plausibly states claims under the FLSA and state statutory law and hold, as a matter of law, that NCAA Division I student athletes cannot be employees of the colleges and universities they attend for purposes of the FLSA solely by virtue of their participation in interscholastic athletics, all of Plaintiffs' claims under the FLSA and state statutory law would have to be dismissed, which should simplify both discovery and any eventual trial. Moreover, the parties in this case have not yet commenced discovery. Consequently, we conclude that interlocutory appeal could materially advance this litigation.

## IV. CONCLUSION

We conclude, for the reasons stated above, that all three of the 28 U.S.C. § 1292(b) factors exist in this case and that the ASD have satisfied their "'burden of persuading the district court that exceptional circumstances exist that justify a departure from the basic policy of postponing appellate review until after the entry of final judgment.'" Fair Hous. Rights Ctr., 2018 WL 4489653, at *2 (quoting Premick, 2007 WL 588992, at *1). Accordingly, we grant the instant motion.

BY THE COURT:

/s/ John R. Padova
_______________________________
John R. Padova, J.

# Appendix B

2021 WL 3771810
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Ralph "Trey" JOHNSON, et al., individually and on behalf of all persons similarly situated
v.
The NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, et al.

CIVIL ACTION NO. 19-5230
|
Filed 08/25/2021

**Synopsis**
**Background:** College and university student athletes brought action asserting claims on behalf of themselves and classes against colleges and universities, including those they attended, and National Collegiate Athletic Association (NCAA), alleging violations of the Fair Labor Standards Act (FLSA), the Pennsylvania Minimum Wage Act (PMWA), the New York Labor Law (NYLL), and the Connecticut Minimum Wage Act (CMWA), and three common law unjust enrichment claims. Colleges and universities they attended filed motions to dismiss.

**Holdings:** The District Court, John R. Padova, Senior District Judge, held that:

long-standing tradition of "amateurism" in NCAA interscholastic athletics failed to support a showing, at motion to dismiss stage of FLSA case, that student athletes were not employees under the FLSA;

fact that student athletes "played" on a team failed to support a showing, at motion to dismiss stage, that student athletes were not employees under the FLSA;

absent showing that colleges and universities failed to pay minimum wages to student athletes in reliance on Department of Labor's (DOL) field operations handbook, colleges and universities failed to support a showing, at motion to dismiss stage, that athletes were not employees under the FLSA on that ground;

even if DOL's field operations handbook was entitled to some defense, student athletes, adequately alleged that NCAA interscholastic athletics, were not types of activities listed in the handbook that did not result in an employer-employee relationship between students and colleges and universities, for purposes of athletes' FLSA action; and

student athletes plausibly alleged they were employees of colleges and universities they attended, under the primary-beneficiary test, to support their FLSA action.

Motion denied.

**Procedural Posture(s):** Motion to Dismiss for Failure to State a Claim.

**Attorneys and Law Firms**

Paul L. McDonald, P. L. McDonald Law LLC, Philadelphia, PA, Michael J. Willemin, Renan F. Varghese, Taylor J. Crabill, Wigdor LLP, New York, NY, for Ralph "Trey" Johnson, Claudia Ruiz, Jacob Willebeek-Lemair, Nicholas Labella, Alexa Cooke, Stephanie Kerkeles.

Alexandria M. Gilbert, Naveen Kabir, Sarah Kroll-Rosenbaum, Steven B. Katz, Constangy Brooks Smith & Prophete LLP, Los Angeles, CA, Donald S. Prophete, Contangy, Brooks, Smith & Prophete, LLP, Kansas City, MO, John E. MacDonald, Constangy Brooks & Smith LLP, Lawrenceville, NJ, for The National Collegiate Athletic Association, Bucknell University, Drexel University, Duquesne University, Fairleigh Dickinson University, La Salle University, Lafayette College, Lehigh University, Monmouth University, Princeton University, Rider University, Robert Morris University, Seton Hall University, Saint Francis University, Saint Joseph's University, Saint Peter's University, Villanova University, University of Delaware, Pennsylvania State University, University of Pennsylvania, University of Pittsburgh, Rutgers, State University of New Jersey, Temple University.

Donald S. Prophete, Contangy, Brooks, Smith & Prophete, LLP, Kansas City, MO, John E. MacDonald, Constangy Brooks & Smith LLP, Lawrenceville, NJ, Naveen Kabir, Sarah Kroll-Rosenbaum, Steven B. Katz, Constangy Brooks Smith & Prophete LLP, Los Angeles, CA, for Cornell University, Sacred Heart University, Fordham University.

## MEMORANDUM

Padova, District Judge

***1** Plaintiffs, student athletes at five of the Defendant colleges and universities, contend that student athletes who engage in interscholastic athletic activity for their colleges and universities are employees who should be paid for the time they spend related to those athletic activities. Plaintiffs, Ralph "Trey" Johnson, Stephanie Kerkeles, Nicholas Labella, Claudia Ruiz, Jacob Willebeek-Lemair, and Alexa Cooke, assert claims on behalf of themselves, a Fair Labor Standards Act ("FLSA") collective, and three state classes against the colleges and universities they attend (or attended) (the "Attended Schools Defendants," or "ASD"), the National Collegiate Athletic Association ("NCAA"), twenty additional named universities that are members of the NCAA Division I ("D1"), and a putative Defendant class made up of 125 NCAA D1 colleges and universities. The First Amended Complaint ("Complaint") asserts claims for violations of the FLSA, 29 U.S.C. § 200 et seq., the Pennsylvania Minimum Wage Act, 43 Pa. Stat. § 333.101 et seq. (the "PMWA"), the New York Labor Law, N.Y. Lab. Law § 191 et seq. ("NYLL"), and the Connecticut Minimum Wage Act, Conn. Gen. Stat. Ann. §§ 31-58 et seq. ("CMWA"). The Complaint also asserts three common law unjust enrichment claims. The ASD have moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on the ground that they do not employ Plaintiffs. [1] We held argument on the Motion on April 14, 2021. For the reasons that follow, the Motion is denied.

**I. FACTUAL BACKGROUND**

The Complaint alleges the following facts. The NCAA is an association that regulates intercollegiate sports and has jurisdiction over approximately 1,100 schools and nearly 500,000 student athletes. (Compl. ¶¶ 44-45.) The NCAA has entered into multi-year, multi-billion-dollar contracts with broadcasters ESPN, CBS, and Turner Sports to show athletic competitions between NCAA D1 member schools, and it distributes shares of those broadcasting fees to its member schools. (Id. ¶ 14.) In addition to shares of broadcasting fees, NCAA D1 member schools also receive fees from multi-year, multi-million-dollar agreements with television and radio networks that they have entered into, either individually or as part of an NCAA conference, to broadcast athletic competitions between NCAA D1 member schools. (Id. ¶ 15.)

Plaintiff Johnson was a student athlete on the Villanova University NCAA football team from June 2013 until November 18, 2017. (Id. ¶ 19.) Plaintiff Kerkeles has been a student athlete on Fordham University's NCAA swimming and diving team since 2016. (Id. ¶ 20.) Plaintiff Labella was a student athlete on Fordham University's NCAA baseball team during the 2018 and 2019 baseball practice and competition seasons. (Id. ¶ 21.) Plaintiff Ruiz was a student athlete on Sacred Heart University's NCAA tennis team from 2014 to 2018. (Id. ¶ 22.) Plaintiff Willebeek-Lemair was a student athlete on Cornell University's NCAA soccer team during the 2017 and 2018 practice and playing seasons. (Id. ¶ 23.) Plaintiff Cooke has been a student athlete on Lafayette College's NCAA tennis team since 2017. (Id. ¶ 24.)

***2** The Defendants are the NCAA and 25 NCAA D1 member schools (the "University Defendants"). (Id. ¶ 25.) The ASD are: Villanova University, Fordham University, Sacred Heart University, Cornell University, and Lafayette College. (Id. ¶¶ 19-24.) The remaining University Defendants, none of which were attended by the named Plaintiffs, are: Bucknell University, Drexel University, Duquesne University, Fairleigh Dickinson University, La Salle University, Lehigh University, Monmouth University, Princeton University, Rider University, Robert Morris University, Seton Hall University, Saint Francis University, Saint Joseph's University, Saint Peter's University, the University of Delaware, Pennsylvania State University, the University of Pennsylvania, the University of Pittsburgh, Rutgers State University of New Jersey, and Temple University. The Complaint also alleges claims against a putative Defendant class made up of the named University Defendants and 100 additional universities that are members of the NCAA D1. (Id. ¶¶ 360-6, Ex. C.) According to the Complaint, these Defendants jointly employed Plaintiffs and similarly situated persons who are members of the putative FLSA Collective. (Id. ¶ 26.)

Student athletes do not have the option to play NCAA sports for wages at any NCAA D1 school. (Id. ¶ 43.) All member schools in the NCAA have agreed not to pay students to participate in intercollegiate varsity sports. (Id. ¶ 51.) The NCAA's Bylaws prohibit schools from offering wages and prohibit student athletes from accepting wages. (Id. (citations omitted).) A student athlete who participates in NCAA sports can only receive payment based on athletic performance through the U.S. Olympic Committee's ("USOC") Operation Gold program, which pays NCAA-eligible student athletes for winning medals. (Id. ¶¶ 56-57 (citations omitted).) The USOC Operation Gold program also permits NCAA-eligible student athletes to receive additional pay through USA sport

 © 2022 Thomson Reuters. No claim to original U.S. Government Works. 

governing bodies and organizations, such as USA Swimming and US Wrestling. (Id. ¶ 58 (citation omitted).)

Student athletes at NCAA D1 schools must schedule classes around their required NCAA athletic activities and cannot reschedule their NCAA athletic activities around their academic programs. (Id. ¶ 90.) As a result, Villanova University only excuses a student athlete from participating in required athletic activities if there is a conflict between practice and a mandatory core class. (Id. ¶ 91 (citation omitted).) For example, when Plaintiff Johnson played football at Villanova University he was required to participate in NCAA athletically related activities on weekdays between 5:45 a.m. and 11:30 a.m. and could not enroll in a non-core class during that time, including classes that were prerequisites for academic degree programs. (Id. ¶ 92 (citations omitted).) In addition, NCAA D1 member schools require student athletes to participate in Countable Athletically Related Activities ("CARA"),[2] which are recorded on timesheets under an NCAA D1 Bylaw. (Id. ¶ 93 (citation omitted).) NCAA Bylaws also require student athletes to participate in Required Athletically Related Activities like fundraising and community service. (Id. ¶ 94.) A student athlete who fails to attend meetings, participate in practice, or participate in scheduled competitions can be disciplined, including suspension or dismissal from the team. (Id. ¶ 95 (citation omitted).) Because student athletes have to schedule their classes around their required athletic activities, many student athletes have reported that participation in NCAA D1 sports have prevented them from taking classes that they wanted to take. (Id. ¶ 96 (citation omitted).) Many student athletes have also reported that their participation in NCAA D1 sports has prevented them from majoring in their preferred major. (Id. ¶ 97 (citations omitted).) Student athletes at Villanova University are also required to participate in activities like meals, physical rehabilitation, dressing, showering, and travel that are not considered CARA. (Id. ¶ 98 (citation omitted).) They are also encouraged to engage in additional workouts and consultations with coaches that are not counted in CARA. (Id. ¶ 99 (citation omitted).) Student athletes have reported spending more than 30 hours per week on athletically related activities, both CARA and non-CARA, and football players who attend schools in the NCAA bowl and championship subdivisions report spending more than 40 hours per week on these activities. (Id. ¶ 100.)

***3** At the same time, the NCAA procures substantial revenues from sports. (See id. ¶¶ 127-29 (citations omitted).) In the 2018 fiscal year, the NCAA reported total revenues of $1,064,403,240. (Id. ¶ 127 (citation omitted).) These revenues came from fees collected for television and marketing rights, championships, tournaments, and sales. (Id.) In their 2016 fiscal year, NCAA D1 schools in the football power five subdivision had median total revenues related to NCAA sports of $97,276,000; schools in the football bowl subdivision reported median total revenues related to NCAA sports of $33,470,000; schools in the football championship subdivision had median total revenues related to NCAA sports of $17,409,000; and schools that did not have NCAA football teams reported median total revenues from NCAA sports of $16,018,000. (Id. ¶ 128 (citation omitted).) Villanova University in particular had total revenues from NCAA sports of $48,977,278 in its 2018 fiscal year. (Id. ¶ 129 (citation omitted).) While student athletes do not receive wages, the NCAA and Villanova University claim that they acquire intangible educational benefits from participating in NCAA sports, including "discipline, work ethic, strategic thinking, time management, leadership, goal setting, and teamwork." (Id. ¶ 131 (quotation omitted).)

The NCAA D1 member schools exercise significant control over their student athletes. The NCAA Bylaws apply to all student athletes who participate in NCAA sports and they address "recruitment, eligibility, hours of participation, duration of eligibility and discipline." (Id. ¶ 170 (citation omitted).) Student athletes who participate in NCAA sports are supervised by coaching and training staff. (Id. ¶ 135 (citation omitted).) NCAA D1 member schools are required to have adult supervisors maintain timesheets for participants. (Id. ¶ 136 (citations omitted).) They also have handbooks that contain standards for controlling student athletes' performance and conduct. (Id. ¶¶ 139-40 (citations omitted).) NCAA D1 member schools impose discipline, including suspension and dismissal from a team, in instances of specified misconduct. (Id. ¶ 140 (citations omitted).) NCAA D1 member schools also publish supplemental handbooks with standards that are used to control the performance and conduct of student athletes both on and off the field. (Id. ¶ 141.) These handbooks contain rules regarding agents, prohibiting certain categories of legal gambling, and restricting social media use, including restrictions on making derogatory comments about other teams. (Id. (citation omitted).) NCAA D1 member schools also have NCAA team policies that restrict the legal consumption of alcohol and legal use of nicotine products by student athletes. (Id. ¶ 143.)

Based upon these factual allegations, the Complaint asserts that Plaintiffs are the employees of Defendants, including the

 © 2022 Thomson Reuters. No claim to original U.S. Government Works. 

ASD, and it asserts eight claims for relief, seeking payment of wages for the time Plaintiffs spent engaged in activities connected to NCAA sports. Count I asserts claims pursuant to the FLSA on behalf of Plaintiffs and the proposed FLSA collective against all Defendants and the proposed Defendant class for failure to pay them minimum wages as employees. Plaintiffs and the members of the proposed FLSA Collective seek unpaid minimum wages, an equal amount as liquidated damages, attorneys' fees, and costs in connection with Count I. Count II asserts claims on behalf of Plaintiffs Johnson and Cooke and the proposed Pennsylvania class against fourteen colleges and universities located in Pennsylvania (the "Pennsylvania-based Defendants"[3]) for violating the PMWA by failing to pay them minimum wages for the hours they spent on activities relating to NCAA D1 sports. Plaintiffs Johnson, Cooke, and the proposed Pennsylvania class seek recovery of unpaid wages, attorneys' fees, and costs in connection with Count II. Count III asserts a claim for unjust enrichment on behalf of Plaintiffs Johnson, Cooke, and the proposed Pennsylvania class against the Pennsylvania-based Defendants for benefiting from the unpaid labor of Plaintiffs Johnson, Cooke, and the proposed Pennsylvania class. Plaintiffs Johnson, Cooke, and the proposed Pennsylvania class seek judgment in an amount equal to the benefits unjustly retained by the Pennsylvania-based Defendants in connection with Count III.

***4** Count IV asserts a claim on behalf of Plaintiffs Kerkeles, Labella, Willebeek-Lemair, and the proposed New York class against eighteen schools located in New York (the "New York-based Defendants[4]") for failure to pay them minimum wages under the NYLL. Plaintiffs Kerkeles, Labella, Willebeek-Lemair, and the proposed New York class seek recovery of unpaid wages, liquidated damages, attorneys' fees, and costs in connection with Count IV. Count V asserts a claim on behalf of Plaintiffs Kerkeles, Labella, Willebeek-Lemair, and the proposed New York class against the New York-based Defendants for failure to pay them wages for all hours they spent on NCAA D1 sports in violation of the NYLL. Plaintiffs Kerkeles, Labella, Willebeek-Lemair, and the proposed New York class seek the total amount of their unpaid straight-time wages, liquidated damages, attorneys' fees, costs, and interest in connection with Count V. Count VI asserts a claim on behalf of Plaintiffs Kerkeles, Labella, Willebeek-Lemair and the proposed New York class against the New York-based Defendants for unjust enrichment for benefiting from their uncompensated labor. Plaintiffs Kerkeles, Labella, Willebeek-Lemair, and the proposed New York class seek judgment in an amount equal to the benefits unjustly retained by the New York-based Defendants in connection with Count VI.

Count VII asserts a claim on behalf of Plaintiff Ruiz and the members of the proposed Connecticut class against five universities located in Connecticut (the "Connecticut-based Defendants"[5]) for violating the CMWA by failing to pay them minimum wages for any and all hours that they allowed Plaintiff Ruiz and the proposed Connecticut class to work. Plaintiff Ruiz and the members of the proposed Connecticut class seek payment of unpaid wages, liquidated damages, attorneys' fees, and costs in connection with Count VII. Count VIII asserts a claim on behalf of Plaintiff Ruiz and the members of the proposed Connecticut class against the Connecticut-based Defendants for unjust enrichment for inducing them to perform work while failing to properly compensate them. Plaintiff Ruiz and the proposed Connecticut class seek judgment in the amount of the benefits unjustly retained by the Connecticut-based Defendants in connection with Count VIII.

The Attended Schools Defendants have moved to dismiss all claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6) on the ground that it does not plausibly allege that Plaintiffs are their employees.

## II. LEGAL STANDARD

When deciding a motion to dismiss pursuant to Rule 12(b)(6), we " 'consider only the complaint, exhibits attached to the complaint, [and] matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents.' " Alpizar-Fallas v. Favero, 908 F.3d 910, 914 (3d Cir. 2018) (quoting Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010)). We take the factual allegations of the complaint as true and " 'construe the complaint in the light most favorable to the plaintiff.' " DelRio-Mocci v. Connolly Props., Inc., 672 F.3d 241, 245 (3d Cir. 2012) (quoting Warren Gen. Hosp. v. Amgen Inc., 643 F.3d 77, 84 (3d Cir. 2011)). However, we " 'are not bound to accept as true a legal conclusion couched as a factual allegation.' " Wood v. Moss, 572 U.S. 744, 755 n.5, 134 S.Ct. 2056, 188 L.Ed.2d 1039 (2014) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)).

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works. 

A plaintiff's pleading obligation is to set forth "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), which gives the defendant " 'fair notice of what the ... claim is and the grounds upon which it rests.' " Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (alteration in original) (quoting Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The complaint must allege " 'sufficient factual matter to show that the claim is facially plausible,' thus enabling 'the court to draw the reasonable inference that the defendant is liable for [the] misconduct alleged.' " Warren Gen. Hosp., 643 F.3d at 84 (quoting Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937 (citing Twombly, 550 U.S. at 556, 127 S.Ct. 1955). In the end, we will grant a motion to dismiss brought pursuant to Rule 12(b)(6) if the factual allegations in the complaint are not sufficient " 'to raise a right to relief above the speculative level.' " Geness v. Admin. Office of Pa. Courts, 974 F.3d 263, 269 (3d Cir. 2020), cert. denied 2021 WL 2044599, ––– U.S. ––––, ––– S.Ct. ––––, ––– L.Ed.2d –––– (2021) (quoting Twombly, 550 U.S. at 555, 127 S.Ct. 1955).

## III. DISCUSSION

***5** The ASD argue that the Complaint fails to state any claims against them because it does not allege facts that would establish that Plaintiffs are their employees, which is a requirement for bringing a claim under the FLSA.[6] See Razak v. Uber Techs. Inc., 951 F.3d 137, 143 (3d Cir. 2020), cert. denied, ––– U.S. ––––, ––– S.Ct. ––––, 209 L.Ed.2d 755 (U.S. May 17, 2021) (noting that "[t]he burden lies with Plaintiffs to prove that they are employees" (citation omitted)). The FLSA defines the term "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). The United States Court of Appeals for the Third Circuit has explained that "[t]his statutory definition is 'necessarily broad to effectuate the remedial purposes of the Act.' " Safarian v. Am. DG Energy Inc., 622 F. App'x 149, 151 (3d Cir. 2015) (quoting Martin v. Selker Bros., 949 F.2d 1286, 1293 (3d Cir. 1991)). "In accordance with this 'expansive definition[ ],' courts must 'look to the economic realities of the relationship in determining employee status under the FLSA.' " Id. (alteration in original) (quoting Martin, 949 F.2d at 1293; citing Tony & Susan Alamo Found. v. Sec'y of Labor, 471 U.S. 290, 301, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985)); see also Tony & Susan Alamo Found., 471 U.S. at 301, 105 S.Ct. 1953 ("The test of employment under the Act is one of 'economic reality.' " (citing Goldberg v. Whitaker House Co-op., Inc., 366 U.S. 28, 33, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961))). The ASD assert three reasons why Plaintiffs cannot be their employees: (1) student athletes such as Plaintiffs are amateurs; (2) the Department of Labor has determined that interscholastic athletes are not employees for purposes of the FLSA; and (3) the Complaint does not plausibly allege that Plaintiffs are employees pursuant to a multi-factor test used to determine whether individuals are employees.

### A. Amateurism

The ASD maintain that Plaintiffs are not employees of the schools they attend, and for which they compete in interscholastic athletics, because they are amateurs and the Supreme Court has recognized that "[c]ollege athletics in the United States is defined by its century-old 'revered tradition of amateurism.' " (ASD Mem. at 6 (quoting Nat'l Collegiate Athletic Ass'n v. Bd. of Regents, 468 U.S. 85, 120, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984)). The ASD rely both on the Supreme Court's decision in National Collegiate Athletic Association v. Board of Regents and on Berger v. National Collegiate Athletic Association, 843 F.3d 285 (7th Cir. 2016), in which the United States Court of Appeals for the Seventh Circuit rejected a lawsuit brought pursuant to the FLSA by former student athletes against the NCAA and more than 120 of its D1 member schools. See Berger, 843 F.3d at 288 (affirming dismissal of lawsuit brought by former student athletes of the University of Pennsylvania alleging that student athletes are employees entitled to minimum wages under the FLSA because "student athletes are not employees and are not covered by the FLSA"). The Berger Court relied on the Supreme Court's recognition of the tradition of amateurism in college sports in Board of Regents to find that this "long-standing tradition defines the economic reality of the relationship between student athletes and their schools." Id. at 291. The ASD maintain that the NCAA member schools' history of " '[n]ot paying student-athletes is *precisely what makes them amateurs.*' " (ASD Mem. at 9

(quoting O'Bannon v. Nat'l Collegiate Athletic Ass'n, 802 F.3d 1049, 1076 (9th Cir. 2015)). Thus, the ASD engage in the circular reasoning that they should not be required to pay Plaintiffs a minimum wage under the FLSA because Plaintiffs are amateurs, and that Plaintiffs are amateurs because the ASD and the other NCAA member schools have a long history of not paying student athletes like Plaintiffs.

The Supreme Court did, indeed, note in Board of Regents that "[t]he NCAA plays a critical role in the maintenance of a revered tradition of amateurism in college sports." 468 U.S. at 120, 104 S.Ct. 2948. However, it recently rejected the NCAA's argument that Board of Regents "expressly approved its limits on student-athlete compensation—and [that] this approval forecloses any meaningful review of those limits today." Nat'l Collegiate Athletic Ass'n v. Alston, ––– U.S. ––––, 141 S. Ct. 2141, 2157, ––– L.Ed.2d –––– (2021). The Supreme Court explained in Alston that:

> ***6** Board of Regents may suggest that courts should take care when assessing the NCAA's restraints on student-athlete compensation, sensitive to their procompetitive possibilities. But these remarks do not suggest that courts must reflexively reject *all* challenges to the NCAA's compensation restrictions. Student-athlete compensation rules were not even at issue in Board of Regents.

Id. at 2158; see also id. at 2167 ("The Court makes clear that the decades-old 'stray comments' about college sports and amateurism made in [Board of Regents] were dicta and have no bearing on whether the NCAA's current compensation rules are lawful." (Kavanaugh, J., concurring) (citation omitted)). As Justice Kavanaugh noted in his concurring opinion in Alston, the argument "that colleges may decline to pay student athletes because the defining feature of college sports ... is that the student athletes are not paid.... is circular and unpersuasive." Id. at 2167 (Kavanaugh, J., concurring). Accordingly, we reject the ASD's argument that Plaintiffs are not employees entitled to minimum wages pursuant to the FLSA because there is a long-standing tradition of amateurism in NCAA interscholastic athletics that defines the economic reality of the relationship between Plaintiffs and the ASD. [7]

B. The Department of Labor

The ASD also argue that Plaintiffs are not their employees for purposes of the FLSA because the Department of Labor has determined that student participation in extracurricular activities, including that of interscholastic athletes, does not result in an employer/employee relationship. The ASD rely on the Field Operations Handbook ("FOH"), which is published by the Wage and Hour Division of the Department of Labor. See Berger, 843 F.3d at 292. "The FOH is an operations manual that provides Wage and Hour Division ... investigators and staff with interpretations of statutory provisions, procedures for conducting investigations, and general administrative guidance." Id. (alteration in original) (quotation omitted). Section 10b24 of the FOH provides that "University or college students who participate in activities generally recognized as extracurricular are generally not considered to be employees within the meaning of the Act." 2016 FOH, Dep't of Labor, https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/FOH_Ch10.pdf (last visited August 10, 2021). FOH § 10b03(e) more specifically provides as follows:

> ***7** As part of their overall educational program, public or private schools and institutions of higher learning may permit or require students to engage in activities in connection with dramatics, student publications, glee clubs, bands, choirs, debating teams, radio stations, intramural and **interscholastic athletics** and other similar endeavors. **Activities of students in such programs, conducted primarily for the benefit of the participants as a part of the educational opportunities provided to the students by the school or institution, are not work of the kind contemplated by ... the Act**

> **and do not result in an employer-employee relationship between the student and the school or institution**.

Id. (emphasis added).

The ASD contend that FOH § 10b03(e) provides a complete defense to Plaintiffs' claims in this action. In support, they cite 29 U.S.C. § 259, which provides as follows:

> no employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay minimum wages ... under the Fair Labor Standards Act of 1938, as amended, ... if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of the agency of the United States specified in subsection (b) of this section.

29 U.S.C.A. § 259(a). Subsection (b) includes the Administrator of the Wage and Hour Division as an agency referred to in subsection (a). 29 U.S.C. § 259(b). "To be insulated from liability under § 259's good faith exception, an employer must 'show it acted in (1) good faith, (2) conformity with, and (3) reliance on the DOL's regulations or the Administrator's Opinion Letter.' " Alvarez v. IBP, Inc., 339 F.3d 894, 907 (9th Cir. 2003) (quoting Frank v. McQuigg, 950 F.2d 590, 598 (9th Cir. 1991)), aff'd, 546 U.S. 21, 126 S.Ct. 514, 163 L.Ed.2d 288 (2005). "The employer bears the burden of proof to establish this exception." Id. However, there is nothing on the record of this Motion to Dismiss upon which we could determine whether the ASD failed to pay minimum wages to their student athletes in reliance on FOH §§ 10b03(e) and 10b24 and, thus, there is nothing upon which we could rely to determine, at this juncture, whether the ASD are entitled to a complete defense to Plaintiffs' FLSA claim based upon § 259(a).[8] Accordingly, we deny the Motion to Dismiss with respect to this argument.

***8** The ASD also argue, in the alternative, that we should give deference to the Wage and Hour Division's interpretation of the FLSA in FOH § 10b03(e) pursuant to Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944), and decide, as a matter of law, that they do not have an employer/employee relationship with their student athletes. In Skidmore, the Supreme Court discussed the degree of deference that should be given to the DOL's rulings and interpretations of the FLSA:

> the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

Id. at 140, 65 S.Ct. 161. Similarly, in Secretary United States Department of Labor v. American Future Systems, Inc., 873 F.3d 420 (3d Cir. 2017), the Third Circuit noted that, while the Wage and Hour Division's "interpretations are not technically 'law,' the regulations nevertheless 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.' " Id. at 427 (quoting Babcock v. Butler County, 806 F.3d 153, 157 n.7 (3d Cir. 2015)). The Third Circuit has adopted a " 'sliding-scale' test" for application of Skidmore deference. Id. (quoting Hagans v. Comm'r of Soc. Sec., 694 F.3d 287, 304 (3d Cir. 2012)). In this test, " 'the level of weight afforded to an interpretation varies depending on [the] analysis of the enumerated factors." Id. (alteration in original) (quoting Hagans, 694 F.3d at 304). "Those factors include whether the interpretation was: (1) issued contemporaneously with the statute; (2) consistent with other agency pronouncements; (3) reasonable given the language and purposes of the statute; (4)

within the expertise of the relevant agency; and (5) part of a longstanding and unchanging policy." Id. (citing Hagans, 694 F.3d at 304-05; Cleary ex rel. Cleary v. Waldman, 167 F.3d 801, 808 (3d Cir. 1999)). We note that "Skidmore deference can ... actually be quite limited, indeed, almost non-deferential." Ebbert v. DaimlerChrysler Corp., 319 F.3d 103, 114 (3d Cir. 2003) (citation omitted). Moreover, an internal agency manual, because it "is not subject to the kind of deliberateness or thoroughness that gives rise to significant deference," is "automatically at the lower end of the Skidmore scale of deference." Id. at 115 (citing Skidmore, 323 U.S. at 140, 65 S.Ct. 161).

The ASD argue that the five factors discussed in American Future Systems weigh in favor of Skidmore deference, and they urge us to accord FOH § 10b03(e) significant deference even though it was not issued contemporaneously with the enactment of the FLSA in 1938. With respect to factors two through five, the ASD argue that FOH § 10b03 is entitled to considerable deference because it is consistent with FOH § 10b24(a); there are no inconsistent opinion letters or other pronouncements of the DOL; determining who is and who is not an employee is within the expertise of the DOL; and, because the Wage and Hour Division issued FOH § 10b03 more than fifty years ago, it is part of a longstanding and unchanging policy. However, there is nothing in the limited record before us to support these contentions. Nonetheless, we will assume, for the purposes of this Motion only, that FOH § 10b03(e) is entitled to some deference.

***9** Plaintiffs argue that FOH § 10b03(e) does not apply to their relationship with the ASD because they participate in NCAA sanctioned college sports and FOH § 10b03(e) only applies to student-run groups. The Seventh Circuit, in Berger, rejected this argument because most of the activities listed in FOH § 10b03(e) are not student run. Berger, 843 F.3d at 293. We agree. Plaintiffs also argue, however, that FOH § 10b03(e) does not apply to students who participate in NCAA sports because those sports, unlike the other extracurricular activities listed in that section, provide no educational benefits to students and are not conducted primarily for the benefit of the participants as part of the educational opportunities provided to students. [9]

The Complaint alleges that student athletes are required to schedule classes around their required NCAA athletic activities and cannot reschedule their NCAA athletic activities around their academic programs. (Compl. ¶ 90.) For example, Villanova University only excuses a student athlete from participating in required athletic activities if there is a conflict between practice and a mandatory core class. (Id. ¶ 91.) When Plaintiff Johnson played football at Villanova University, he was required to participate in NCAA athletically related activities on weekdays between 5:45 a.m. and 11:30 a.m. during the football practice and playing seasons and could not enroll in a non-core class during that time, including classes that were "prerequisites for academic degree programs." (Id. ¶ 92.) In addition, because student athletes are required to schedule their classes around their required athletic activities, many student athletes have reported that participation in NCAA D1 sports has prevented them from taking classes that they want to take and from majoring in their preferred major. (Id. ¶¶ 96-97.) Student athletes are also required by their schools to participate in CARA and in non-countable Required Athletically Related Activities. (Id. ¶¶ 93-94.) Student athletes have reported spending more than 30 hours per week on CARA and non-CARA activities and football players in the bowl and championship subdivisions report spending more than 40 hours per week on these activities. (Id. ¶ 100.) Many student athletes believe that these activities, which are required by the NCAA, prevent them from being able to keep up with their classes during the playing and practice seasons. (Id. ¶ 102.)

***10** The Complaint also alleges that "Student Athlete performance is integral to the billion dollar Big Business of NCAA sports." (Id. ¶ 113.) NCAA "sports contests **cannot** take place without athletes." (Id. ¶ 121 (citation omitted).) Only student athletes eligible under NCAA Bylaws, who are not paid, may participate on teams in NCAA-governed sports. (Id. ¶¶ 122, 124.) NCAA D1 member schools benefit financially from the promotion of NCAA sports by student athletes. (Id. ¶ 125.) As we previously discussed, in its 2018 fiscal year, the NCAA reported total revenues of $1,064,403,240, which was primarily generated by "television and marketing rights fees, championships, tournaments, and sales." (Id. ¶ 127 (citation omitted).) In their 2016 fiscal year, NCAA D1 schools reported median total revenues from NCAA sports as follows: (1) schools in the football power five subdivision had median total revenues of $97,276,000; schools in the football bowl subdivision had median total revenues of $33,470,000; (3) schools in the football championship subdivision had media total revenues of $17,409,000; and (4) schools that did not have NCAA football teams had median total revenues

of $16,018,000. (Id. ¶ 128 (citation omitted).) Villanova University reported total revenues from NCAA sports of $48,977,278 in its 2018 fiscal year. (Id. ¶ 129.) The Complaint also specifically alleges that the intangible educational benefits that the NCAA and Villanova University claim that student athletes acquire from participating in NCAA sports, i.e., "discipline, work ethic, strategic thinking, time management, leadership, goal-setting and teamwork" are not comparable to the tangible benefits that accrue to NCAA member schools as a result of student athletes competing in NCAA sports, such as revenue and the benefits from school branding. (Id. ¶ 131 (quotation omitted).)

" '[C]onstru[ing] the complaint in the light most favorable to the plaintiff,' " DelRio-Mocci, 672 F.3d at 245 (quoting Warren Gen. Hosp., 643 F.3d at 84), we find that the Complaint plausibly alleges that NCAA D1 interscholastic athletics are not conducted primarily for the benefit of the student athletes who participate in them, but for the monetary benefit of the NCAA and the colleges and universities that those student athletes attend. We further find that the Complaint plausibly alleges that the NCAA D1 interscholastic athletics are not part of the educational opportunities provided to the student athletes by the colleges and universities that they attend but, rather, interfere with the student athletes' abilities to participate in and get the maximum benefit from the academic opportunities offered by their colleges and universities. Accordingly, we conclude that the Complaint plausibly alleges that NCAA D1 interscholastic athletics are not the types of activities listed in FOH § 10b03(e) that "do not result in an employer-employee relationship between the student and the school or institution." FOH § 10b03(e). We further conclude, accordingly, that FOH § 10b03(e) does not require us to find, as a matter of law, that Plaintiffs cannot be employees of the ASD. Consequently, we deny the Motion to Dismiss as to this argument.

C. The Economic Reality of the Relationship Between Plaintiffs and the ASD

1. Expectation of compensation

As we mentioned above, we "look to the economic realities of the relationship in determining employee status under the FLSA." Safarian, 622 F. App'x at 151 (quotation and citation omitted). The ASD argue that Plaintiffs and other student athletes cannot be employees of the schools they attend because they participate in interscholastic athletics for those schools without any expectation of payment and this amateurism "defines the economic reality of the relationship between student athletes and their schools." Berger, 843 F.3d at 291. The ASD maintain that, while the FLSA's definition of employee is exceedingly broad, it does not include an individual who works for a covered enterprise without any express or implied compensation agreement. The ASD rely on Walling v. Portland Terminal Co., 330 U.S. 148, 67 S.Ct. 639, 91 L.Ed. 809 (1947), in which the Supreme Court noted that the definition of employee in Section 3(g) of the FLSA "was obviously not intended to stamp all persons as employees who, without any express or implied compensation agreement, might work for their own advantage on the premises of another." Id. at 152, 67 S.Ct. 639. In Portland Terminal, the Supreme Court determined that individuals who participated in a railroad company's training session for prospective brakemen were not employees of the railroad entitled to minimum and overtime wages under the FLSA, even though they were required to complete the training session before the railroad would hire them. Id. at 150, 153, 67 S.Ct. 639. The Court noted that the definitions of employer and employee in the FLSA, while broad, "cannot be interpreted so as to make a person whose work serves only his own interest an employee of another person who gives him aid and instruction." Id. at 152, 67 S.Ct. 639. Thus, since the record in Portland Terminal showed "that the railroads receive no 'immediate advantage' from any work done by the trainees," the Supreme Court held that those trainees were not employees within the meaning of the FLSA. Id. at 153, 67 S.Ct. 639. In contrast, the Complaint in this action alleges that the ASD receive considerable financial advantage from Plaintiffs' participation in interscholastic athletics. (See Compl. ¶¶ 128-29.) We conclude, accordingly, that Portland Terminal is not controlling here.

***11** The ASD also rely on Tony & Susan Alamo Foundation, in which the Supreme Court determined that some individuals who believed themselves to be volunteers for the Foundation, but who relied on non-wage benefits they received from the Foundation, were employees under the FLSA. The Tony and Susan Alamo Foundation was a nonprofit religious organization that derived its income from commercial businesses staffed by individuals associated

with the Foundation, many of whom had been drug addicts before being rehabilitated by the Foundation. Tony & Susan Alamo Found., 471 U.S. at 292, 105 S.Ct. 1953. The Foundation provided its associates with room and board but did not pay them salaries. Id. The Secretary of Labor filed an action against the Foundation, asserting that the Foundation violated the minimum wage, overtime, and recordkeeping provisions of the FLSA by not paying the associates wages. Id. at 293, 105 S.Ct. 1953. Some Foundation associates testified at the trial and "vigorously protested the payment of wages, asserting that they considered themselves volunteers who were working only for religious and evangelical reasons." Id. Nonetheless, the Supreme Court affirmed the lower court's determination that the associates were employees even though they considered themselves to be volunteers and did not seek wages under the FLSA. Id. at 293-94, 306, 105 S.Ct. 1953. The Supreme Court explained that "the purposes of the Act require that it be applied even to those who would decline its protections. If an exception to the Act were carved out for employees willing to testify that they performed work 'voluntarily,' employers might be able to use superior bargaining power to coerce employees to make such assertions, or to waive their protections under the Act." Id. at 302, 105 S.Ct. 1953 (citations omitted). Consequently, we cannot dismiss Plaintiffs' claims simply because they commenced their careers as student athletes for the ASD without an express or implied compensation agreement, as in this regard, they are like the Tony and Susan Alamo Foundation associates who had no expectation that they would be paid wages and yet were found to be employees. [10] Rather, we look at the whole "economic reality" of Plaintiffs' relationships with the ASD. Id. at 301, 105 S.Ct. 1953 (quotation omitted).

***12** When we consider whether Plaintiffs are employees of the ASD, we are mindful "that the determination of the relationship does not depend on ... isolated factors but rather upon the circumstances of the whole activity." Rutherford Food Corp. v. McComb, 331 U.S. 722, 730, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947). Thus, " '[w]hen determining whether someone is an employee under the FLSA, economic reality rather than technical concepts is to be the test of employment.' " Thompson v. Real Est. Mortg. Network, 748 F.3d 142, 148 (3d Cir. 2014) (quoting In re Enter. Rent-A-Car Wage & Hour Emp. Pracs. Litig., 683 F.3d 462, 467 (3d Cir. 2012)). " 'Under this theory, the FLSA defines employer 'expansively,' and with 'striking breadth.' The Supreme Court has even gone so far as to acknowledge that the FLSA's definition of an employer is 'the broadest definition that has ever been included in any one act.' " Id. (quoting In re Enter. Rent-A-Car, 683 F.3d at 467-68).

Courts have, accordingly, developed multifactor tests to be used in determining, based on the circumstances of the whole relationship between the parties, whether individuals are employees or independent contractors, whether entities are joint employers, and whether individuals are employees or interns. See Donovan v. DialAmerica Mktg., Inc., 757 F.2d 1376, 1382 (3d Cir. 1985) (adopting a six-factor test developed in Donovan v. Sureway Cleaners, 656 F.2d 1368, 1370 (9th Cir. 1981), to determine whether an individual is an employee or an independent contractor); In re Enter. Rent-A-Car, 683 F.3d at 469 (adopting a four-factor test to determine whether entities are joint employers); Glatt v. Fox Searchlight Pictures, Inc., 811 F.3d 528, 536-37 (2d Cir. 2016) (adopting a non-exhaustive set of seven factors to be used to determine whether an individual is a student intern or an employee). The ASD ask us to reject the use of any existing multifactor tests because they fail to "account[ ] for the 'revered tradition of amateurism in college sports.' " (ASD Mem. at 36 (quoting Board of Regents, 468 U.S. at 120, 104 S.Ct. 2948).) As we have rejected the ASD's argument that Plaintiffs cannot be their employees because of the "revered tradition of amateurism in college sports," Board of Regents, 468 U.S. at 120, 104 S.Ct. 2948, we also reject their argument that we should not use existing multifactor tests because they fail to account for this "revered tradition."

2. The Glatt multi-factor test

The ASD suggest in the alternative, that, of the three multifactor tests mentioned above, the Glatt test would be the best for analyzing the economic reality of the relationship between student athletes and their schools. In Glatt, the United States Court of Appeals for the Second Circuit considered "the broad question of under what circumstances an unpaid intern must be deemed an 'employee' under the FLSA and therefore compensated for his work." 811 F.3d

at 533. The Second Circuit determined that "the proper question is whether the intern or the employer is the primary beneficiary of the relationship." Id. at 536. According to Glatt, the "primary beneficiary test" has three important features: (1) "it focuses on what the intern receives in exchange for his work[;]" (2) "it also accords courts the flexibility to examine the economic reality as it exists between the intern and the employer[;]" and (3) "it acknowledges that the intern-employer relationship should not be analyzed in the same manner as the standard employer-employee relationship because the intern enters into the relationship with the expectation of receiving educational or vocational benefits that are not necessarily expected with all forms of employment." Id. (citations omitted). Additionally, the United States Court of Appeals for the Ninth Circuit has commented that "that the primary beneficiary test best captures the Supreme Court's economic realities test in the student/employee context and that it is therefore the most appropriate test for deciding whether students should be regarded as employees under the FLSA." Benjamin v. B & H Educ., Inc., 877 F.3d 1139, 1147 (9th Cir. 2017). The primary beneficiary test described in Glatt utilizes the following seven factors:

***13** 1. The extent to which the intern and the employer clearly understand that there is no expectation of compensation. Any promise of compensation, express or implied, suggests that the intern is an employee—and vice versa.

2. The extent to which the internship provides training that would be similar to that which would be given in an educational environment, including the clinical and other hands-on training provided by educational institutions.

3. The extent to which the internship is tied to the intern's formal education program by integrated coursework or the receipt of academic credit.

4. The extent to which the internship accommodates the intern's academic commitments by corresponding to the academic calendar.

5. The extent to which the internship's duration is limited to the period in which the internship provides the intern with beneficial learning.

6. The extent to which the intern's work complements, rather than displaces, the work of paid employees while providing significant educational benefits to the intern.

7. The extent to which the intern and the employer understand that the internship is conducted without entitlement to a paid job at the conclusion of the internship.

Glatt, 811 F.3d at 536-37. "Applying these considerations requires weighing and balancing all of the circumstances. No one factor is dispositive and every factor need not point in the same direction for the court to conclude that the intern is not an employee entitled to the minimum wage." Id. at 537. Moreover, these factors "are non-exhaustive—courts may consider relevant evidence beyond the specified factors in appropriate cases." Id.

The ASD argue that the allegations of the Complaint demonstrate that the Glatt factors either weigh in favor of finding that Plaintiffs are not their employees or are neutral, so that the application of these factors to the facts alleged in the Complaint demonstrate that Plaintiffs are not their employees. The ASD maintain that the factual allegations of the Complaint clearly allege that the first Glatt factor, whether there is an "expectation of compensation" between the Plaintiffs and the ASD, favors a determination that Plaintiffs are not employees of the ASD. Pertinent to this factor, the Complaint alleges that "Student Athletes do **not** have any options to choose any opportunities to play NCAA sports for wages at any NCAA D1 member school. Student Athletes also do **not** have any options to bargain for such wages with any such school." (Compl. ¶ 43.) It also alleges that all NCAA member schools "have mutually agreed **not** to offer wages for participation in intercollegiate Varsity sports, and they have adopted bylaws prohibiting schools from offering wages and Student Athletes from accepting wages." (Id. ¶ 51.) Upon consideration of these allegations, we conclude that the facts alleged in the Complaint with respect to the first Glatt factor weigh in favor of finding that Plaintiffs are not the employees of the ASD.

The ASD also contend that the facts alleged in the Complaint demonstrate that the second, third and fifth Glatt factors, "[t]he extent to which the internship provides training that would be similar to that which would be given in an educational environment," "[t]he extent to which the

internship is tied to the intern's formal education program," and "[t]he extent to which the internship's duration is limited to the period in which the internship provides the intern with beneficial learning," Glatt, 811 F.3d at 537, all weigh in favor of finding that Plaintiffs are not their employees because the Complaint alleges that student athletes derive some educational benefit from participation in NCAA athletics. The ASD specifically rely on the allegation that the NCAA and Villanova University have contended, in connection with a different lawsuit, that "[l]earning benefits from participation in NCAA athletics include, but are not limited to: discipline, work ethic, strategic thinking, time management, leadership, goal-setting, and teamwork." (Compl. ¶ 70.)

***14** The Complaint does not contain any factual allegations that specifically pertain to whether student athletes' participation in interscholastic athletics "provides training that would be similar to that which would be given in an educational environment" or whether student athletes' participation in NCAA D1 sports in their respective universities is limited in time to the period in which their participation provides them with "beneficial learning." See Glatt, 811 F.3d at 537. Accordingly, we conclude that the facts alleged in the Complaint with respect to the second and fifth Glatt factors are neutral with respect to whether Plaintiffs are employees of the ASD. The Complaint alleges, in connection with the third Glatt factor, that "[t]he NCAA and Villanova University admit [in connection with another lawsuit] that NCAA sports are not tied to the student's formal education program by integrated coursework or receipt of academic credit." (Compl. ¶ 76 (citation omitted).) We conclude, accordingly, that the facts alleged in the Complaint with respect to the third Glatt factor, "the extent to which the position is tied to the intern's formal education program," 811 F.3d at 537, weigh in favor of a finding that Plaintiffs are employees of the ASD.

The ASD further argue that the Complaint alleges facts that would demonstrate that the fourth Glatt factor, "[t]he extent to which the internship accommodates the intern's academic commitments by corresponding to the academic calendar," 811 F.3d at 537, weighs in favor of finding that Plaintiffs are not their employees even though there is an "arguably-imperfect correspondence between some athletic seasons and the academic calendar," because the Complaint alleges that the ASD and other NCAA D1 member schools support student athletes in the classroom. (ASD Mem. at 43.) The ASD rely on allegations that they track the time that student athletes devote to their sports, that some NCAA D1 conferences have approved proposals to require time management plans for each sport and to prohibit athletically related activities during some time periods, and that Villanova University provides academic support for students. (See Compl. ¶¶ 105-11.) On the other hand, Plaintiffs maintain that the facts alleged in the Complaint demonstrate that this factor weighs in favors of finding that they are employees because the Complaint alleges that they are required to participate in athletically related activities that take in excess of 30 hours per week and interfere with their academic commitments by preventing them from taking classes they wish to take and from majoring in the subjects they wish to major in. (Id. ¶¶ 93-100.) We conclude that the Complaint alleges facts that demonstrate that Plaintiffs' participation in NCAA athletic activities for the ASD interferes with their academic pursuits and, thus, that the facts alleged with respect to the fourth Glatt factor weigh in favor of finding that Plaintiffs are employees of the ASD.

The ASD also argue that the facts alleged in the Complaint with respect to the sixth Glatt factor, "[t]he extent to which the intern's work complements, rather than displaces, the work of paid employees while providing significant educational benefits to the intern," Glatt, 811 F.3d at 537, weighs in favor of finding that Plaintiffs are not their employees, because student athletes are not alleged to displace the work of any paid employees. Plaintiffs do not contend that their participation in interscholastic athletics displaces any paid employees but maintain that the allegations of the Complaint demonstrate that this factor weighs in favor of finding that they are employees because the Complaint alleges that they gain no educational benefits from being student athletes. The Complaint alleges that the NCAA and Villanova University have admitted that student athletes do not receive any academic credit for participating in NCAA sports and that "NCAA sports are not tied to the student's formal education program by integrated coursework." (Compl. ¶ 76.) As we discussed above, the Complaint also alleges that the amount of time that student athletes spend in connection with their participation in NCAA D1 athletics interferes with their ability to take the classes that they want to take and major in the fields they prefer and inhibits their ability to keep up with the classes they do take. (See id. ¶¶ 90-94, 96-97, 100, 102-03.) We therefore conclude that the Complaint plainly alleges that Plaintiffs'

participation in interscholastic athletics for the ASD does not provide them with significant educational benefits and we further conclude, accordingly, that the facts alleged in the Complaint with respect to the sixth Glatt factor weigh in favor of a finding that Plaintiffs are the employees of the ASD, even though they are not alleged to displace other paid employees.

***15** With respect to the seventh Glatt factor, "[t]he extent to which the intern and the employer understand that the internship is conducted without entitlement to a paid job at the conclusion of the internship," 811 F.3d at 537, the ASD also assert that the facts alleged in the Complaint weigh in favor of a finding that Plaintiffs are not their employees because the Complaint alleges that student athletes are not entitled to paid jobs at their respective NCAA D1 schools after graduation. (Compl. ¶ 132 (citation omitted).) We agree and conclude that the facts alleged in the Complaint with respect to the seventh Glatt factor weigh in favor of a finding that Plaintiffs are not the employees of the ASD.

In sum, we have found that the facts alleged in the Complaint would, if proven, support conclusions that the first and seventh Glatt factors weigh in favor of finding that the Plaintiffs are not employees of the ASD, that the second and fifth Glatt factors would be neutral, and that the third, fourth, and sixth Glatt factors would weigh in favor of finding that Plaintiffs are employees of the ASD. Balancing all of these factors, and mindful that none of these "factor[s] is dispositive and [that] every factor need not point in the same direction," Glatt, 811 F.3d at 537, we conclude that the Complaint plausibly alleges that Plaintiffs are employees of the ASD under the Glatt test. [11]

## IV. CONCLUSION

For the foregoing reasons, we conclude that the Complaint plausibly alleges that Plaintiffs are employees of the ASD for purposes of the FLSA. Accordingly, we deny the Motion to Dismiss in its entirety. An appropriate order follows.

### All Citations

--- F.Supp.3d ----, 2021 WL 3771810

## Footnotes

1. The NCAA and the other named Defendant universities have also filed a Motion to Dismiss pursuant to Rule 12(b)(6) on the ground that the Complaint does not plausibly allege that they were joint employers of Plaintiffs. That motion will be addressed separately.
2. CARA include team conditioning; discussions of strategy; on-field, floor or court activity; review of game film; strength training; individual workouts; and meetings with coaches. (Compl. ¶ 93 (citation omitted).)
3. The Pennsylvania-based Defendants are identified in the Complaint as Bucknell University, Drexel University, Duquesne University, La Salle University, Lafayette College, Lehigh University, Robert Morris University, Saint Francis University, Saint Joseph's University, Villanova University, the University of Pennsylvania, Pennsylvania State University, the University of Pittsburgh, and Temple University. (Compl. ¶ 272 n. 22.)
4. The New York-based Defendants are identified in the Complaint as Colgate University, Canisius College, Columbia University, Cornell University, Fordham University, Manhattan College, Iona College, Marist College, Hofstra University, Long Island University, Brooklyn College, Niagara University, St. John's University, Siena College, St. Bonaventure University, St. Francis College Brooklyn, Syracuse University, and Wagner College. (Compl. ¶ 389 n. 28.)
5. The Connecticut-based Defendants are identified in the Complaint as Fairfield University, the University of Hartford, Quinnipiac University, Sacred Heart University, and Yale University. (Compl. ¶ 409 n. 29.)
6. We note that, while the ASD seek dismissal of all of Plaintiffs' claims against them, they do not directly address Plaintiffs' state statutory and common law claims, which comprise Counts II through VIII of the Complaint).

7 The ASD also argue that student athletes who play intercollegiate sports cannot be “employees” under the FLSA because the common usage of the terms “employment” and “work” do not encompass students playing sports. (ASD Mem. at 20-21.) The ASD rely on the following comment in Berger: “[s]imply put, student-athletic ‘play’ is not ‘work.’ ” 843 F.3d at 293. However, athletic “play” is “work” when the athletes are paid, which is evident from the number of individuals who are employed to “play” for professional teams competing in football, baseball, basketball, and ice hockey, among other sports. We also note that many students are “employed” to do paid work, such as students who have work-study positions with their respective universities. Accordingly, we reject the ASD's contention that student athletes who play intercollegiate sports cannot be “employees” under the FLSA because the common usage of the terms “employment” and “work” do not encompass students playing sports.

8 The ASD argue that their good faith reliance on FOH § 10b03(e) is “demonstrated—objectively—by over 50 years of unanimity among state and federal courts that student-athletes are not *ipso facto* ‘employees’ of their schools.” (ASD Mem. at 28.) However, whatever else is demonstrated by such unanimity, if it exists, such unanimity does not show what the ASD relied on when they individually decided not to pay minimum wages to their student athletes. The ASD also contend that their reliance on FOH § 10b03(e) in other lawsuits challenging their failure to pay student athletes pursuant to the FLSA is subject to judicial notice and establishes their good faith reliance on that section. However, the ASD's reliance on FOH § 10b03(e) in defending lawsuits alleging that they violated the FLSA by failing to pay student athletes a minimum wage does not establish that they relied on § 10b03(e) when they made their decisions not to pay student athletes minimum wages. We find, accordingly, that there is nothing on the limited record before us on this Motion to Dismiss that sheds light, one way or the other, on whether the ASD relied on FOH § 10b03(e) in not paying minimum wages to their student athletes.

9 The ASD argue that Plaintiffs’ interpretation of FOH § 10b03(e) as applying only to extracurricular activities that are “conducted primarily for the benefit of the participants as a part of the educational opportunities provided to the students,” FOH § 10b03(e), ignores the plain meaning of that section and defies canons of statutory construction because “the phrase ‘conducted primarily for the benefit of the participants as a part of the educational opportunities provided’ modifies ‘programs,’ the word it immediately follows.” (ASD Mem. at 30.) The ASD further contend that “FOH § 10b03(e) itself reflects the DOL's conclusion that interscholastic sports ***are*** programs that are conducted primarily for the benefit of the participants as part of the educational opportunities provided to them.” (Id.) However, the ASD have failed to elaborate on these contentions or support them with references to the canons of statutory construction purportedly defied.

Plaintiffs posit that the phrase “primarily for the benefit of the participants as a part of the educational opportunities provided to the students” in FOH § 10b03(e) is used to describe a necessary factor that all of the listed extracurricular activities have in common. Plaintiffs maintain that this use of the phrase follows the cannon of statutory construction known as “*ejusdem generis*,” which means “of the same kind or class.” Black's Law Dictionary (11th ed. 2019). Black's Law Dictionary explains that *ejusdem generis* is “[a] canon of construction holding that when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same class as those listed.” Id. We conclude, for the purposes of this Motion, that Plaintiffs’ suggested interpretation of the phrase “primarily for the benefit of the participants, as part of the educational opportunities provided to the students” as describing a necessary factor of the extracurricular activities that are listed in FOH § 10b03(e) is reasonable and comports with the canons of statutory construction.

10 The ASD rely on the Supreme Court's consideration of the associates’ reliance on the in-kind benefits they received from the Tony & Susan Alamo Foundation as creating a requirement that employees have an expectation that they will be compensated by wages or by in-kind benefits. See Tony & Susan Alamo Found., 471 U.S. at 301, 105 S.Ct. 1953 (agreeing with the district court's determination “the associates were entirely dependent upon the Foundation for long periods, in some cases several years” and, therefore, “must have expected to receive in-kind benefits—and expected them in exchange for their services” (quotation

omitted)). However, in Tony & Susan Alamo Foundation, the Supreme Court was concerned with distinguishing between volunteers and employees of a religious organization. Id. at 302-03, 105 S.Ct. 1953. The Supreme Court noted in that case that the FLSA "reaches only the 'ordinary commercial activities' of religious organizations, and only those who engage in those activities in expectation of compensation," so that "[o]rdinary volunteerism is not threatened by this interpretation of the statute." Id. at 302-03, 105 S.Ct. 1953 (quoting 29 CFR § 779.214). Thus, Tony & Susan Alamo Foundation's concern with the expectation of compensation in that case related to whether the associates were volunteers as that term is defined by the FLSA, a concern that does not exist in the instant case. See id. at 303 n.25, 105 S.Ct. 1953 ("The Solicitor General states that in determining whether individuals have truly volunteered their services, the Department of Labor considers a variety of facts, including the receipt of any benefits from those for whom the services are performed, whether the activity is a less than full-time occupation, and whether the services are of the kind typically associated with volunteer work."). Furthermore, while the existence of an expectation of compensation was one of the factors considered in both Tony & Susan Alamo Foundation and Portland Terminal, it is only one of several non-dispositive factors that courts use to analyze whether an individual is an employee. For example, as the Ninth Circuit noted in Dawson v. National Collegiate Athletic Association, 932 F.3d 905 (9th Cir. 2019), expectation of compensation is only one of the circumstances that is relevant to the economic reality of the relationship between possible employees and their employers. Id. at 909 ("The Supreme Court has found a number of circumstances relevant in evaluating economic reality, including: (1) expectation of compensation, Portland Terminal, 330 U.S. at 152, 67 S.Ct. 639; (2) the power to hire and fire, Goldberg [v. Whitaker House Cooperative, Inc., 366 U.S. 28, 33, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961)]; (3) and evidence that an arrangement was 'conceived or carried out' to evade the law, Portland Terminal, 330 U.S. at 153, 67 S.Ct. 639."). In addition, expectation of compensation was just one of seven non-dispositive factors considered by the United States Court of Appeals for the Second Circuit in determining whether a student intern is an employee in Glatt v. Fox Searchlight Pictures, Inc., 811 F.3d 528, 536 (2d Cir. 2016).Moreover, expectation of compensation is not even one of the six factors used by the Third Circuit for distinguishing between employees and independent contractors. See Donovan v. DialAmerica Mktg., Inc., 757 F.2d 1376, 1382 (3d Cir. 1985); Razak, 951 F.3d at 144-45. Thus, while expectation of compensation is one factor that may shed light on whether an individual is an employee, it is not determinative.

11 The parties also disagree regarding whether the Complaint plausibly alleges that Plaintiffs are employees of the ASD using the test outlined in DialAmerica, 757 F.2d 1376. Since we have determined that the Complaint plausibly alleges that Plaintiffs are employees of the ASD for purposes of the FLSA under the Glatt test, we need not address whether the Complaint also alleges that Plaintiffs are employees of the ASD under the DialAmerica test.

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.